[Crim. No. 7141. First Dist., Div. Two. Mar. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. BILLY DARREL HARRIS, Defendant and Appellant.

M. Van Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Jerome C. Utz, Deputy Attorneys General, for Plaintiff and Respondent.

TAYLOR, J.—Defendant, Billy D. Harris, appeals[1] from a judgment of conviction entered on a jury verdict finding him guilty of aggravated assault while confined in a state prison (Pen. Code, § 4501). He contends that: he was deprived of his Sixth Amendment right of confrontation and his right to separate counsel; the prosecution was guilty of several acts of prejudicial misconduct; and the trial court erred, to his prejudice, in the admission and rejection of certain evidence, as well as in its instructions to the jury.

As there are no contentions concerning the sufficiency of the evidence, a brief summary of the pertinent facts will suffice. On August 28, 1967, appellant was an inmate of the Soledad Correctional Facility. At 10 a.m., appellant, the codefendant, Clifford Jones (hereafter Jones), George Nick Detervis (hereafter Detervis), and 9 other inmates of the second tier of O Wing were released from their cells for an exercise period. About an hour later, an altercation began at the end of the tier between Jones and Detervis. There was testimony that appellant ran to Jones and Detervis and tried to break up the fight. Detervis ended up on the floor calling for help. Correctional Officers Kennedy and Wimbley testified they saw appellant and Jones strike Detervis with stabbing motions. The officers were about 115 feet away and separated from the men by a grill. They saw no weapon but saw the downward thrusting motions of appellant and Jones as a white cloth streamer came from each hand with each motion. Officer Kennedy twice yelled ''Lock-up,'' in an attempt to return the men to their cells, but the altercation continued.

Additional officers were summoned, including McGuire. who opened the grill and threw a tear gas grenade in the vicinity of the struggle. Just before the grenade exploded McGuire saw appellant astraddle Detervis with his hands around Detervis' neck. attempting to beat the latter's head on the cement floor. After the grenade exploded, vision was obscured by the smoke. The fight broke up and Jones leaped up to the windowsill and threw an object with a white streamer out of the window of the cell block. Subsequently, Officer Villegas found a 10-inch-long bloody stiletto-type weapon made from

---

[1]The notice of appeal was prematurely filed but this court exercised its discretion to treat it as timely filed (Cal. Rules of Court, rule 31(a)).

heavy wire with a 4 to 6 foot piece of white cloth directly beneath the window.

After all the men were locked up in their cells, there was blood found on the stairs, the floor and the clothing of appellant and Jones. Detervis was taken to the hospital in shock, bleeding from the mouth and nose as the result of multiple contusions about the face, with puncture wounds on the anterior chest wall, as well as 21 puncture wounds on the posterior chest wall. Some of the punctures had penetrated the chest and caused a partial collapse of both lungs. The puncture wounds were caused by a small instrument about $\frac{1}{4}$ to $\frac{3}{8}$ inch in diameter.

Appellant's defense was that his only involvement in the altercation between Jones and Detervis was an effort to break it up. The white streamer was from a piece of cloth he was rolling around his hand to be subsequently used to start a fire to heat some coffee. Appellant's version of the incident was corroborated by several inmates. No weapon was seen in appellant's hand. A letter written by Jones, stating that he was glad that he did not kill Detervis as he had wanted to and that he would probably get five to life for it, was admitted.

Appellant and Jones were jointly charged by information. After being informed of their right to counsel, but not of their right to separate counsel, both elected to represent themselves. During the preliminary proceedings, both were assisted by the legal advisor appointed by the court. Jones relied entirely on a defense of insanity and a separate hearing on his sanity was held after the trial of appellant and Jones. This court appointed separate counsel on appeal. Thereafter, at the request of Jones, his appeal was dismissed.

■■■ Appellant first contends that the judgment must be reversed because the prosecution's misconduct in attempting to impeach Detervis deprived him of his right to confrontation under the Sixth Amendment to the Constitution of the United States.

The record indicates that Detervis was called as a witness for the prosecution and after identifying himself, indicated he would refuse to answer all questions on the ground of the Fifth Amendment. The trial court explained to Detervis that he was not charged with any offense, could not properly claim the privilege and by refusing to answer, was in contempt of court. Detervis continued to refuse to answer all questions on grounds of the Fifth Amendment.

The prosecution then proceeded to ask questions (set forth in the footnote below)[2] that called for hearsay answers concerning statements Detervis had made to various officers about the fight. After the prosecution asked: ''Did you tell Lieutenant Adkinson that Jones grabbed you from behind and started choking you and Harris stabbed you?'' appellant's hearsay objection was sustained.

Appellant again interposed an objection when the prosecuting attorney asked Detervis if he had talked to Lt. Adkinson. This objection was overruled. After the court pointed out that under the new Evidence Code the matter was admissible for purposes of impeachment, the prosecution indicated that, indeed, it was laying a foundation to bring Lt. Adkinson in to impeach Detervis. There then followed a series of questions (set forth in the footnote below),[3] each of which was designed to elicit further hearsay statements concerning appellant's participation in the attack on Detervis. Detervis, on grounds of the Fifth Amendment, refused to answer all of these questions, as well as those subsequently posed by the defense. Lt. Adkinson was not called as a witness and investigator Smith was not asked to impeach Detervis.

---

[2] ''Q. Did you tell Mr. G. D. Adkinson, Lieutenant G. D. Adkinson at a disciplinary proceeding you fought only in self-defense? A. I refuse to answer on the grounds it may incriminate me. Q. Did you tell him that you heard that someone told Jones and Harris to jump you?''

[3] ''BY MR. PITMAN: Q. Did you tell Lieutenant Adkinson that Jones grabbed you from behind and started choking you and Harris stabbed you? A. I refuse to answer on the grounds it may incriminate me. Q. Did you talk to an investigator from the district attorney's office by the name of Gene Smith about the incident in which you received some stab wounds on August 28, 1967? A. I refuse to answer on the grounds it may incriminate me. Q. Did you tell Gene Smith how it happened? A. Refuse to answer on the grounds it may incriminate me. Q. Did you tell Gene Smith that Harris said during your stabbing that— MR. HARRIS: Hearsay, Your Honor, I object. MR. PITMAN: I am laying a foundation for impeachment, Your Honor. THE COURT: Objection overruled. BY MR. PITMAN: Q. He said that this is for Berg and then another stab, he said this is for Moska (phonetics) or Solis? A. I refuse to answer. Q. Did you tell Gene Smith that? A. I refuse to answer on the grounds it may incriminate me. Q. Did Harris, the defendant Harris tell you that this stabbing was being done for Spots and Moska? MR. JONES: Objection, Your Honor, hearsay. MR. HARRIS: Your Honor— THE COURT: Overruled. MR. HARRIS: He is trying to—this man can tell you, he don't want to. He didn't want to testify and this man is trying to— THE COURT: Proceed. MR. HARRIS: You are using Gestapo techniques on him. THE COURT: Proceed. BY MR. PITMAN: Q. Did you tell Gene Smith, the district attorney's investigator, that the action started on the steps and then was finished on the floor on the second tier and that is the action in which you were stabbed? A. Refuse to answer on the grounds it may incriminate me. Q. Did you receive any stab wounds at all on August 28, 1967? A. Refuse to answer on the grounds it may incriminate me.''

The procedure here employed by the prosecution is on all fours with that condemned in *Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074].[4] In that case, Douglas and an alleged accomplice, Loyd, were tried separately for assault with intent to murder. Loyd was tried first, convicted, and subsequently called as a witness at Douglas' trial. Because Loyd planned to appeal his conviction, his counsel advised him to rely on the privilege of self-incrimination. Loyd did so and persisted, even after the court advised him that he could not rely on the privilege because of his conviction, and ordered him to answer.

Thereafter, the court granted the state's motion to declare Loyd a hostile witness and permitted him to be cross-examined. Under the guise of cross-examination, the state read from a purported confession signed by Loyd, asking after every few sentences: "Did you make that statement?" Each time, Loyd asserted the privilege and refused to answer, but the questioning continued until the whole document had been read. Thereafter, the state called three officers who identified the document as Loyd's confession.

The U.S. Supreme Court, after noting that the confrontation clause of the Sixth Amendment was applicable to the states (*Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]), held that the procedure violated Douglas' right to cross-examination secured by the confrontation clause. The court noted (at p. 419 [13 L.Ed.2d at p. 937]) that Loyd's alleged statement that Douglas had fired the shotgun constituted the only direct evidence that he had done so and formed a crucial link in the proof of Douglas' act and the requisite intent to murder. The court also stated that Loyd could not be cross-examined on a statement imputed to but not admitted by him, and continued at pages 419 and 420 [13 L.Ed.2d at p. 938]: "Nor was the opportunity to cross-examine the law enforcement officers adequate to redress this denial of the essential right secured by the Confrontation Clause. Indeed, their testimony enhanced the danger that the jury would treat the Solicitor's questioning of Loyd and Loyd's refusal to answer as proving the truth of Loyd's alleged confession. But since their evidence tended to show only that Loyd made the confession, cross-examination of

---

[4]We can give no credence to the People's arguments that appellant waived the matter here as he failed to object to each question. After the trial court indicated that the matter was admissible, any further objections would have been futile. Significantly, the identical point was made in *Douglas* and totally discredited (at p. 423 [13 L.Ed.2d at p. 939]).

them as to its genuineness could not substitute for cross-examination of Loyd to test the truth of the statement itself. (*Motes* v. *United States,* 178 U.S. 458 [44 L.Ed. 1150, 20 S.Ct. 993] ; cf. *Kirby* v. *United States,* 174 U.S. 47 [43 L.Ed. 890, 19 S.Ct. 574].

"Hence, effective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer. We need not decide whether Loyd properly invoked the privilege in light of his conviction. It is sufficient for the purposes of deciding petitioner's claim under the Confrontation Clause that no suggestion is made that Loyd's refusal to answer was procured by the petitioner, see *Motes* v. *United States, supra,* 178 U.S. at 471 [44 L.Ed. at 1154] ; on this record it appears that Loyd was acting entirely in his own interests in doing so."

Similarly here, Detervis was acting in his own interest in asserting the privilege, and there is no suggestion that his refusal to answer was procured by appellant. There was no way for appellant to test the truth of the hearsay statements attributed to Detervis but not admitted by him. There was nothing to impeach. Under the circumstances, the jury could only assume that the hearsay statements must be true as Detervis was held in contempt for failing to answer. We conclude that the district attorney's conduct clearly violated appellant's Sixth Amendment right of confrontation.

We, therefore, turn to the question of whether this error of federal constitutional dimensions was prejudicial in the light of the standard enunciated in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. ■ The *Chapman* standard requires a reversal if, upon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, and the error must be considered harmless if the likelihood of material influence is not within the realm of reasonable possibility (*People* v. *Haston,* 69 Cal.2d 233, 252 [70 Cal.Rptr. 419, 444 P.2d 91]). We note that this is the first time that a California appellate court has faced the proper application of *Douglas.*[5]

---

[5] *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], held Evidence Code section 1204 unconstitutional under *Pointer* v. *Texas, supra.* Although frequently raised, *Douglas* has usually been held inapplicable to the facts. For example, see *People* v. *Williams,* 265 Cal.App.2d 888 [71 Cal.Rptr. 773].

In the instant case, as in *Douglas, supra,* the error resulted in bringing before the jury a series of statements that related to the only crucial issue before it. As appellant's participation in the fight was not disputed, the only question before the jury was whether he did so with the intent of breaking up the incident or with the intent to join Jones in the assault. On this aspect of the case, the evidence of the prosecution witnesses (who saw appellant make stabbing motions and beat the victim's head against the floor) and the defense witnesses (who agreed that appellant was only trying to stop the altercation) was in direct conflict. The officers were about 115 feet away behind a grill. Unlike the prisoners, they did not observe the beginning of the altercation. The officers became aware of the incident only after appellant was already involved. Under the circumstances of this case, we cannot say that the erroneous injection of the hearsay statements did not materially influence the jury in arriving at its verdict. We conclude that there was a reasonable possibility that the jury would have reached a different result in the absence of this and the other errors. Accordingly, we hold that the denial of appellant's Sixth Amendment right of confrontation was prejudicial (*Chapman* v. *California, supra*).

As we have concluded that the judgment must be reversed, we will briefly discuss some of the remaining contentions that relate to issues that may occur on retrial.

Appellant contends that he was deprived of his right to counsel because the trial court failed to advise him of his right to separate counsel. The record indicates that appellant and Jones were not so advised. As indicated above, appellant's defense was that his participation in the altercation between Jones and Detervis was limited to attempts to stop the fight, while Jones relied on insanity. Thus, there was no conflict of interest between them and the court's failure to advise them of the right to separate counsel was, under the circumstances of the first trial where each elected to act as his own counsel, harmless beyond a reasonable doubt (*Chapman* v. *California, supra;* cf. *People* v. *George,* 259 Cal.App.2d 424, 433 [66 Cal.Rptr. 442]). However, on retrial, the error should not be repeated. At the second trial, appellant and Jones may pursue different defenses that could lead to a conflict. Furthermore, our Supreme Court recently pointed out that no waiver of the right to separate counsel can be implied from a defendant's silence where he has not been informed of that right (*People* v. *Chacon,* 69 Cal.2d 765, 774 [73 Cal.Rptr. 10, 447 P.2d 106]).

Appellant next contends that the prosecution was guilty of prejudicial misconduct in introducing into evidence the order of commitment and summary of his sentence showing that he had been convicted of assault with a deadly weapon. The record indicates that both items were admitted without objection.

We note that in *People* v. *Chacon, supra,* similar evidence was introduced without objection, and as here, the court, having already concluded that the judgments had to be reversed on other grounds, proceeded to consider the matter of the prior convictions in the context of potential errors that might arise on retrial (at p. 777) and stated: ''The evidence of these prior convictions was admissible to prove that each was serving a life term at the time of the assault on Smith. When a prior conviction is an essential element of an offense, it is admitted to prove something other than the defendant's bad character, and is admissible for that purpose. (Evid. Code, § 1101, subd. (b) ; *People* v. *Dorado* (1965) 62 Cal.2d 338, 358 [42 Cal.Rptr. 169, 398 P.2d 361] ; *People* v. *Wells* (1949) 33 Cal.2d 330, 338 [202 P.2d 53].)

''Nevertheless, we feel that *the prejudicial effect of this cumulative testimony outweighed the legitimate purposes served by its admission.* The impact of this testimony cannot be overstated : at the outset of the trial, the jury was presented with the picture of four hardened, vicious convicts charged with another offense in a long line of similar violent offenses. Even the most conscientious juror would be hard pressed to concentrate solely on the facts of the crime charged in the indictment.'' (Italics added.) Here, as in *Chacon,* the prosecution could have established the fact that appellant was a prisoner in a less prejudicial way than that used.

Appellant next complains that the prosecution was guilty of prejudicial misconduct by inferring that the disclosure of the names of inmates who were not eyewitnesses to the incident and who subsequently talked to Officer Kennedy would endanger the lives of those inmates. The matter arose during the cross-examination of Officer Kennedy. As the statement was based on facts not in evidence, it constituted misconduct (*People* v. *Kirkes,* 39 Cal.2d 719, 724-725 [249 P.2d 1]).

During the cross-examination of the doctor called by the prosecution to testify about the wounds sustained by Detervis. Jones asked if the doctor had seen the weapon. In response to the court's inquiry as to whether the prosecution planned to introduce the weapon into evidence, the prosecut-

ing attorney replied: "I don't intend to, Your Honor, for security reasons." This statement was completely without purpose and insinuated that the introduction of the weapon into evidence would have caused danger in the courtroom simply because of the presence of appellant and Jones. As such, it was clearly erroneous misconduct and should be avoided on retrial.

Appellant next contends that the trial court erred in advising and encouraging him to offer evidence of his good character and in allowing the prosecution to cross-examine a character witness about specific acts. The record indicates that appellant's witness Shoemaker, a prison inmate, testified that just prior to the incident, he had been talking to appellant and had an opportunity to observe the latter's actions. Then appellant asked: "Mr. Shoemaker, did you know me prior to this?" and Shoemaker replied: "Well, pretty well. I don't really know you." When appellant continued: "Do I seem like the type of person to stab him?" the prosecution objected, but the court permitted character testimony. As subsequent questioning disclosed that Shoemaker had known appellant casually and for only one month, we are of the opinion that he was not sufficiently well qualified to testify to appellant's peaceful character, and the prosecution's extensive cross-examination to elicit his unawareness of appellant's prior acts of violence was extremely prejudicial.

The trial court erred in striking Shoemaker's testimony that it looked as if appellant was trying to break up the fight after the prosecution objected on the basis of opinion. The record indicates that the witness was in a position to observe the fight and was, therefore, competent to testify about it. Furthermore, the fight was the kind of occurrence that is recognized as requiring a description by opinion (cf. Witkin, Cal. Evidence (2d ed. 1966) § 397) as under the circumstances, it would be difficult to see the precise sequence of blows, etc. For the same reason, it was error for the trial court to have struck out the testimony of the defense witness Breedlove that it did not look as if appellant participated in the assault.

Finally, we turn to appellant's contention that the trial court erred in failing to give, *sua sponte,* an instruction indicating the limited purpose for which the jury could consider certain evidence. This contention is without merit, as *People v. Grimes,* 148 Cal.App.2d 747, 749-750 [307 P.2d 932], the authority cited by appellant, was overruled precisely on this

point in *People* v. *White,* 50 Cal.2d 428, 430-431 [325 P.2d 985]; *(People* v. *Talbot,* 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Knighton,* 250 Cal.App.2d 221, 231 [58 Cal.Rptr. 700]).

We think that in addition to the matters discussed above, the record rather clearly indicates that appellant was not capable of representing himself *(In re Fresquez,* 67 Cal.2d 626 at p. 630 [63 Cal.Rptr. 271, 432 P.2d 959]), and the trial court should again make every effort to have defendant accept counsel.

The judgment appealed from is reversed.

Shoemaker, P. J., and Agee, J., concurred.