[Crim. No. 15587. Fourth Dist., Div. One. Jan. 17, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFONSO JOSE RIOS, Defendant and Appellant.

856

**COUNSEL**

Ronis, Ronis & Ronis, Jan Edward Ronis and Patrick Q. Hall for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, Thomas E. Warriner, Assistant Attorney

General, Frederick R. Millar, Jr., and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUTLER, J.**—Alfonso Jose Rios appeals his jury conviction for first degree murder (Pen. Code,[1] § 187) and true finding of the firearm use allegation (§ 12022.5). Relying upon his Sixth Amendment right to confrontation, Rios contends the admission of hearsay statements of two key witnesses, Torres and Carrillo, under section 1235 of the Evidence Code, as prior inconsistent statements, constituted prejudicial error; that without such evidence there was insufficient corroboration of accomplice Ramos' testimony to satisfy the requirements of section 1111 for conviction; and there was prejudicial prosecutorial misconduct requiring reversal. As we shall explain, we have concluded the admission of the hearsay statements was prejudicial error and there was insufficient corroboration of the accomplice testimony; we therefore reverse the judgment.

I

*Facts and Procedural History*
*Independent Trial Evidence*

On October 25, 1982, Wallace Lord was shot to death in the apartment he occupied with his wife at 2620 "A" Street in the City of San Diego. There were no eyewitnesses to the murder. Evidence at trial established at about 9 p.m. that evening, his wife was doing renovation work at another unit in the complex she and Lord owned. She heard three loud bangs and started walking toward their apartment to investigate. She heard her husband say, "Help me, someone please help me." She found Lord lying on his left side slumped against the screen door. She could see blood on his chest. She screamed for someone to call the police. Neighbor Adrian Ruis Gonzalez called for help. Afterwards, he found a yellow baseball cap on the sidewalk in front of his apartment.

Dan Guerriero, who lived next door to the Lords, returned to the apartment complex from a nearby U-Totem at approximately 9 p.m. to find Gonzales and Mrs. Lord leaning over Lord. Guerriero ran for the police.

Shortly after 9 p.m. the police arrived at the scene and found Lord lying in the doorway of his apartment with a gunshot wound in the chest. In the

[1]All statutory references are to the Penal Code unless otherwise specified.

apartment, the officers found an overturned serving tray, broken glass, spilt milk and a walkman-type radio on the floor; and a .25 caliber casing on a couch near Lord's body. Lord died from a .25 caliber gunshot wound to the chest.

On the night of the shooting, another neighbor, Joyce Duffus, was at her front door four or five houses away from the Lord apartment on "A" Street when she heard gunshots about 9 p.m. She went outside and heard someone running past her house toward 27th Street. Looking in that direction, Ms. Duffus saw a very short person, approximately five feet three inches tall, wearing dark clothing. The person appeared to be a man or boy of Mexican descent with medium to collar-length curly hair. Ms. Duffus did not see his features.

Some days later a .25 caliber casing was found in a woodpile on a patio area behind the Lord apartment. Police criminalists analyzed this casing and found it had been fired from the same weapon as the casing earlier found in the apartment.

### Accomplice Testimony of Ramos

After accepting immunity from the prosecution for the murder charge, Joe Ramos testified to his version of the facts tying Rios to the murder.

On October 25, 1982, Ramos met Rios, known as "Squid," and another individual known as "Duende," who was later identified as David Carrillo, at Dave's Market located at 26th and Broadway in San Diego. The three discussed plans to commit a burglary. Rios talked with Carrillo about needing a weapon and the two of them left for approximately 10-15 minutes. When they returned to the store, Carrillo had a gun in his waistband.

Rios and Ramos continued walking toward and then down "A" Street. They talked about burglarizing an empty house. They saw somebody leaving the apartment complex at 2620 "A" Street. Ramos described the individual as a tall, skinny man who walked across "A" Street toward the U-Totem. Rios and Ramos decided to burgle the residence. Rios put a stocking over his head and entered the apartment. Ramos stood watch on the sidewalk in front of the complex. Immediately after Rios entered the apartment, Ramos heard something drop or fall. He became frightened and took off. While he was running away, his yellow baseball cap fell off his head and he heard a gunshot coming from behind him. He thought Rios had been shot. Ramos had not seen Rios with a gun that night; he had not seen Carrillo give Rios the gun.

Two days later, Ramos saw Rios at Dave's Market and asked him "what happened?" "He told me that when he went in there was a man sitting down and that he came up at him. The man grabbed him and they started fighting for the gun and that he shot him and that the gun went off."

### The Questioned Testimony

Out of the presence of the jury, the prosecutor sought the testimonies and admissibility of the prior statements of Ramon Torres and David Carrillo for further corroboration Rios committed the murder.

On December 1, 1982, Detectives Dreis and Thwing went to Torres' home. Dreis told Torres he had information Torres knew something about the homicide. Dreis told Torres he would be charged as an accessory unless Torres disclosed what he knew. Torres went willingly to the police station where he told Dreis that three or four days after Lord's death, Rios admitted to him Rios shot Lord during an attempted burglary because he was afraid of being identified. Torres had been called to testify at the preliminary hearing, had refused to answer any questions, was found in criminal contempt, was sentenced to six months in county jail and was in custody at the time of the trial. Torres informed the trial court he would again refuse to answer any questions even though he had no privilege and could face further contempt charges.

The record does not inform as to the circumstances surrounding statements made by Carrillo. On December 3, 1982, at the police station, Carrillo talked with Dreis. Carrillo's statements to Dreis acknowledged his involvement in the case. Carrillo told Dreis he was also known as "Duende" and had been at Dave's Market with Rios and Ramos on October 25, 1982, when the three talked about "doing a job." He said Rios wanted a gun for the job, so he gave Rios his .25 automatic pistol. He split off from Rios and Ramos and heard a shot about five minutes later. Carrillo did not see Rios again for two to four weeks. At that time Carrillo said he told Rios the cops would be looking for him, but Rios said he didn't care. Carrillo had not previously testified and was granted full immunity from prosecution for the burglary and murder. Carrillo, like Torres, refused to answer any questions at trial.

After extensive argument by counsel, the court concluded the refusals to answer by Torres and Carrillo would constitute an evasion or implied denial of their earlier statements to Dreis and ruled the statements admissible as inconsistent statements under Evidence Code section 1235.

Pursuant to the court's evidentiary ruling, the prosecutor, with the jury present, questioned Torres and Carrillo on their statements. Each gave his

name, Carrillo added his age, and each thereafter refused to answer any further questions.[2]

---

[2]The prosecutor framed the questions in the context of the statements made by the witness to Dreis. For example, he asked Torres and received Torres' response:

"Q. Did you tell Detective Dreis and Detective Thwing on December 1st of 1982 that you were at Dave's Market three or four days after the shooting on 'A' Street, and the defendant here, who you called Squid, was at Dave's Market with you and he told you that he had done a burglary and he had shot a guy in the house. [¶] Did you tell that to Detective Dreis and Detective Thwing?

"A. I refuse to answer that question.

"THE COURT: You are ordered to answer.

"THE WITNESS: I refuse to answer that question, your honor.

"Q. Did you tell Detective Dreis and Detective Thwing that the man in the house came towards Squid and he shot him, and Squid told you that he had a stocking on his head and that he said that he had shot twice in the house? [¶] Did he tell you that?

"A. I refuse to answer that question.

". . . . . . . . . . . . . . . . . . .

"Q. Mr. Torres, did you tell Detective Dreis and Detective Thwing on December 1st of 1982 that the defendant, who you knew by the name of Squid, told you that he did not expect anyone to be home and that when he got inside he discovered that someone was there, and that this man had come toward him and that Squid had said he was afraid of being identified and he shot him? [¶] Did you tell that to Mr. Dreis and Mr. Thwing?

"A. I refuse to answer that question."

The prosecutor put the same type of questions to Carrillo:

"Q. Mr. Carrillo, on October the 25th of 1982, did you see the man who is seated here at counsel table that you know by the name of Squid and a man you know by the name of Ramos at Dave's Market at 26th and Broadway in San Diego?

"A. I refuse to answer any question.

". . . . . . . . . . . . . . . . . . .

"Q. Did you on that night give to the defendant here, Mr. Rios, a .25 automatic pistol?

"A. I refuse to answer any question.

". . . . . . . . . . . . . . . . . . .

"Q. On December the 3rd of 1982 did you have a conversation with a detective from the San Diego Police Department by the name of Fred Dreis?

"A. I refuse to answer any question. I told you.

". . . . . . . . . . . . . . . . . . .

"Q. Did you tell Mr. Dreis that 'the gun Squid used was mine; it's a .25 automatic, black with wood handles; I found it someplace about two weeks before'? Did you tell that to Mr. Dreis?

"A. I refuse to answer any questions.

". . . . . . . . . . . . . . . . . . .

"Q. Did you tell Mr. Dreis that 'that night we—me, Rocky, and Squid—were up there at 25th and Broadway. Squid was talking about doing a job, and he wanted a gun. He said he needed a gun to do a job. I had the gun with me, so I gave it to him. We split. I went someplace, and Rocky and Squid went the other way. About five minutes later I heard this shot. After the shot I just split.' [¶] Did you tell that to Detective Dreis?

"A. I refuse to answer it.

". . . . . . . . . . . . . . . . . . .

"Q. Did you tell Mr. Dreis that 'I didn't see Squid again that night. I saw him about two weeks or a month later, but he didn't say anything about it. I told him the cops would be looking for him, and he said he didn't care.' [¶] Did you tell that to Detective Dreis?

". . . . . . . . . . . . . . . . . . .

"A. I refuse to answer.

". . . . . . . . . . . . . . . . . . .

"Q. Did you tell Mr. Dreis, 'Yeah, I was carrying the gun that night, and he wanted it

Detective Dreis was allowed to testify to statements they had given him in December. His testimony tracked the factual context of the prosecutor's questions to Torres and Carrillo.

During closing argument, the prosecution stressed the testimony of Torres and Carrillo as it came out of the mouth of Detective Dreis and told the jurors Torres' testimony corroborated the testimony of Ramos. The trial transcript of the district attorney's questioning of Torres and the testimony of Detective Dreis concerning the police report on Torres was reread to the jury during its deliberations. After further deliberations, the jury convicted Rios of first degree murder.

Rios properly noted his objections to the questioned evidence, moved for mistrial, and asked for a new trial before bringing this appeal.

## II

 Rios first contends he was denied his constitutional right of confrontation when the trial court admitted the out-of-court statements of Torres and Carrillo; Rios asserts those statements were not inconsistent with any trial testimony of Torres and Carrillo, and were improperly admitted pursuant to Evidence Code section 1235. We agree.

 The Sixth Amendment right to confrontation, made applicable to the states through the Fourteenth Amendment (*Pointer* v. *Texas* (1965) 380 U.S. 400, 403-405 [13 L.Ed.2d 923, 925-927, 85 S.Ct. 1065]) provides a defendant in a criminal case has a right "to be confronted with the witnesses against the defendant." (See *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Ohio* v. *Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]; art. I, § 15 of the Cal. Const.) The three-fold purpose of confrontation is (1) to ensure reliability by means of the oath, (2) to expose the witness to the probe of cross-examination, and (3) to permit the trier of fact to weigh the demeanor of the witness. (*California* v. *Green, supra,* at p. 158; see also *People* v. *Green* (1971) 3 Cal.3d 981, 989 [92 Cal.Rptr. 494, 479 P.2d 998]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738].) However, neither the federal nor California's confrontation clause absolutely prohibit use of all hearsay. (*Pointer* v. *Texas, supra,* 380 U.S. at p. 407 [13 L.Ed.2d at p. 928]; *People* v. *Stritzinger, supra,* at p. 515.)

---

so I gave it to him. He needed it for a job, but I didn't know what he was going to do with it. Thought it might be because of some gang stuff.'

" . . . . . . . . . . . . . . . . . . . . . . .

"A. I refuse to answer any question."

"The California Evidence Code is consistent with this formulation." (*People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515.) A hearsay statement is admissible if it comes within one of the established exceptions to the hearsay rule under the reasoning there are inherent traditional indicia of reliability ensuring the trustworthiness of the statement. (Evid. Code, § 1200; Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 448, pp. 412-413.)

"The United States Supreme Court has refrained from making sweeping declarations which would determine the validity under the confrontation clause of all exceptions to the hearsay rule. (*California* v. *Green* (1970) 399 U.S. 149, 162 . . . .) ■ It has said, however, that 'hearsay rules and the Confrontation Clause are generally designed to protect similar values,' [citation] and 'stem from the same roots.' (*Dutton* v. *Evans* (1970) 400 U.S. 74, 86 . . . .) Both are intended to further the accuracy of the fact-finding process. [Citation.] But the two are not coterminous; a statement otherwise admissible under the hearsay rule may be prohibited from introduction into evidence by the confrontation clause." (*People* v. *Jones* (1984) 155 Cal.App.3d 653, 662-663 [202 Cal.Rptr. 289].)

Usually, the trial court makes a two-step determination: (1) does the statement come in under some exception to the hearsay rule, and (2) does the statement or circumstances surrounding the making of the statement have sufficient guarantees of reliability so as not to violate the defendant's right of confrontation? (*Dutton* v. *Evans* (1970) 400 U.S. 74 [27 L.Ed.2d 213, 91 S.Ct. 210]; *California* v. *Green, supra,* 399 U.S. 149.) The initial decision of whether the required facts exist to permit admission of statements under an established hearsay exception is vested in the trial court's discretion. Its ruling will not be disturbed unless those facts are not supported by a preponderance of the evidence. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Jones, supra,* 155 Cal.App.3d 653, 660.) The second step usually need only be reached if the first requirement is satisfied.

Here the trial court admitted in evidence the out-of-court statements of Torres and Carrillo pursuant to Evidence Code section 1235. ■ Under this exception to the hearsay rule, a court may allow earlier statements of a witness in evidence to prove the truth of their content where they are inconsistent with matters to which the witness testifies at trial.[3] The inconsistency may either be express or implied, and will be deemed implied where the court finds a witness falsely claiming failure to remember facts

---

[3]Section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with section 770."

in order to deliberately avoid testifying as to those facts. (*People* v. *Green, supra,* 3 Cal.3d 986-989; *People* v. *Simmons* (1981) 123 Cal.App.3d 677, 680 [177 Cal.Rptr. 17].) However, because the Legislature retained the requirement the witness' testimony be inconsistent with a prior statement when it enacted Evidence Code section 1235, a prior statement is not admissible where the record shows no reasonable basis for concluding the witness' responses are evasive and untruthful. (*People* v. *O'Quinn* (1980) 109 Cal.App.3d 219, 225 [167 Cal.Rptr. 141]; *Clifton* v. *Ulis* (1976) 17 Cal.3d 99, 104 [130 Cal.Rptr. 155, 549 P.2d 1251]; see, e.g., (*People* v. *Parks* (1971) 4 Cal.3d 955, 960-961 [95 Cal.Rptr. 193, 485 P.2d 257]; *People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700].) While our Supreme Court has not elucidated what kind of record is necessary to support a finding of evasiveness (*People* v. *O'Quinn, supra,* 109 Cal.App.3d at p. 226), the appellate courts have consistently applied the rule set forth in *People* v. *Sam* there is no "testimony" from which an inconsistency with any earlier statement may be implied when the witness honestly has no recollection of the facts. We find the same result is required where a witness gives no testimony and refuses to answer all questions. (See *People* v. *Harris* (1969) 270 Cal.App.2d 863, 866-869 [76 Cal.Rptr. 130].)

■ We conclude there is no relevant legal difference between the situation where the stonewalling witness refuses to answer any questions and the situation where the witness totally recalls no facts, for purposes of determining inconsistency under Evidence Code section 1235. In both situations there is simply no "statement" in the record which is inconsistent, or for that matter consistent, with prior statements; there is no "express testimony" at all from which to infer or deduce implied inconsistency. (*People* v. *Shipe* (1975) 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701]; *People* v. *Sam, supra,* at pp. 208-210; *People* v. *Harris, supra,* at pp. 866-869.)

Section 1235, by its express terms, requires a witness give testimony from which an inconsistency, express or implied, may be determined. Where, as here, the witnesses give no testimony, there is no evidence to support a finding of inconsistency. Section 1235 simply does not apply.

■■ Assuming arguendo the statements are properly admissible under section 1235, we find the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness.[4] (*Peo-*

---

[4]The record shows the court specifically found Rios had not procured the refusals of Torres and Carrillo to testify. Where a witness improperly exercises a privilege a defendant

*ple* v. *Shipe, supra,* 49 Cal.App.3d at pp. 349-351; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 385 [87 Cal.Rptr. 394]; *Douglas* v. *Alabama* (1965) 380 U.S. 415, 419-420 [13 L.Ed.2d 934, 937-938, 85 S.Ct. 1074].)

■ As discussed above, *People* v. *Green, supra,* 3 Cal.3d 981 at page 989, following *California* v. *Green, supra,* teaches that prior statements may be admissible at trial and not violate confrontation rights if the declarant/witness is under oath to insure reliability, is exposed to cross-examination, and is before the trier of fact to weigh the declarant/witness' demeanor. The principal consideration in this analysis is the extent to which the declarant/witness is available to testify and be subject to cross-examination. (*United States* v. *Rogers* (8th Cir. 1976) 549 F.2d 490, 500.)[5] The goal of cross-examination is to draw out "discreting demeanor to be viewed by the factfinder." (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 63, fn. 6 [65 L.Ed.2d 597, 606, 100 S.Ct. 2531].) However, the United States Supreme Court has never intimated cross-examination is the only means by which statements may be qualified for admission under the confrontation clause. Surrounding circumstances may give assurance of reliability to statements not subject at the time to cross-examination and provide the jury with factors for judging the credibility of the witness and the truthfulness of the testimony. (*United States* v. *West* (4th Cir. 1978) 574 F.2d 1131, 1137 [50 A.L.R. Fed. 833].)

■ Nevertheless, we do not find such circumstances here. While both Torres and Carrillo took the stand, there was no opportunity to contemporaneously cross-examine when the prior statements were made or the ability to meaningfully cross-examine Torres and Carrillo at trial. Observing the demeanor of a totally recalcitrant witness when questioned about matters he refuses to answer "is as meaningless as attempting to gain information as to the truth of the unknown facts from his responses. Even *California* v. *Green*'s holding rests on the assumption a meaningful trial confrontation will provide 'most of the lost protections [of contemporaneous cross-examination such as oath, observance of demeanor and cross examination].' (*Id.,* at p. 158. . . .)" (*People* v. *Simmons* (1981) 123 Cal.App.3d 677, 681 [177 Cal.Rptr. 17].) There was no evidence presented from which the jury

may still claim violation of his constitutional right of confrontation so long as the defendant did not actually procure the witness' refusal to answer the prosecutor's questions. (*People* v. *Shipe, supra,* at p. 349; *People* v. *Harris* (1969) 270 Cal.App.2d 863, 869 [76 Cal.Rptr. 130].)

[5]Generally, " '[t]he main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " (*Davis* v. *Alaska* (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d 347, 353, 94 S.Ct. 1105].)

could evaluate the circumstances surrounding the making of the previous statements by Torres and Carrillo; no way to test the truth of the statement itself. "Nor was the opportunity to cross-examine the law enforcement officers adequate to redress this denial of the essential right secured by the Confrontation Clause." (*Douglas* v. *Alabama, supra,* 380 U.S. 415, 419-420 [13 L.Ed.2d 934, 938].) On this record the jury had no basis for evaluating the truth of the prior statements. (*California* v. *Green, supra,* 399 U.S. 149.) Torres' and Carrillo's statements are thus inadmissible because admissibility would deny Rios his constitutional right to confrontation and cross-examination. The court prejudicially erred in admitting the statements under Evidence Code section 1235. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### III

The People alternatively contend the statements of Torres and Carrillo are properly admissible as statements against penal interests under Evidence Code section 1230. To be admissible under that section, a statement must be specifically disserving to the "declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230; See *People* v. *Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296].) ▋ Evidence Code section 1230 also requires the declarant be "unavailable" to testify. A witness who refuses to testify out of a mental state induced by fear (*People* v. *Rojas* (1975) 15 Cal.3d 540, 551 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]), as well as one who refuses to testify based upon the privilege against self-incrimination (*People* v. *Smith* (1970) 13 Cal.App.3d 897, 902 [91 Cal.Rptr. 786, 52 A.L.R.3d 875]), may be held to be "unavailable" for purposes of Evidence Code section 1230. (See Evid. Code, § 240, subd. (a)(3).) "Unavailability of a witness is a preliminary fact to be established to the satisfaction of the trial court by the proponent of the evidence. [Citations.]" (*People* v. *Sul* (1981) 122 Cal.App.3d 355, 361 [175 Cal.Rptr. 893].)

▋ Where, as here, the court below did not make any determination Evidence Code section 1230 was applicable, we review the record to see if the statements might qualify as declarations against penal interest because a valid evidentiary ruling will generally be upheld even if the originally stated reason is in error. (*People* v. *Gurley* (1972) 23 Cal.App.3d 536, 539-540, fn. 1 [100 Cal.Rptr. 407].) Concerning the preliminary finding of "unavailability" of Torres or Carrillo, the record does not reflect any evidence

of threats or violence to either witness which would prevent them from testifying. Each remained contumacious without expressing reasons for his refusal. While the record shows the court took reasonable steps to induce Torres to testify, possibly supporting a finding of "unavailability," there is no showing the court took any steps designed to induce Carrillo to testify. (*People* v. *Sul, supra,* 122 Cal.App.3d at pp. 365-367.)

The focus of this hearsay exception though is the second preliminary fact—"the basic trustworthiness of the declaration." (*People* v. *Bullard* (1977) 75 Cal.App.3d 764, 769 [142 Cal.Rptr. 473].) The judge is to consider all the surrounding circumstances to determine if a reasonable person in Torres' or Carrillo's position would have made the statements if they weren't true. (*People* v. *Chapman* (1975) 50 Cal.App.3d 872, 878 [123 Cal.Rptr. 862].) On the record before us, it is difficult to tell if Torres' statements were "clothed with sufficient indicia of reliability." (*People* v. *Shipe, supra,* 49 Cal.App.3d at pp. 352-354.) Torres made his statements to Dreis in December 1982, approximately six weeks after the murder and conversation with Rios. The record does not show how the police were able to contact Torres or whether Torres knew the statements when made were disserving to his penal interest. Concerning Carrillo, his statements to Dreis appear to satisfy the requirement they be against penal interest because he admitted he gave the gun to Rios for the burglary.

Regardless, under *People* v. *Shipe, supra,* 49 Cal.App.3d 343, and *People* v. *Coble* (1976) 65 Cal.App.3d 187 [135 Cal.Rptr. 199], "even where declarations of a coparticipant satisfy the requirements for admissibility under Evidence Code section 1230, the court must inquire whether, under the circumstances of the particular case, use of a statement effectively denies a defendant his right to confront and cross-examine an adverse witness." (*People* v. *Claxton* (1982) 129 Cal.App.3d 638, 666 [181 Cal.Rptr. 281].) Moreover, the statements must be excluded "if they are so rife with condemning facts against the defendant that they are devastating or crucial to his case." (*People* v. *Frutos* (1984) 158 Cal.App.3d 979, 986 [205 Cal.Rptr. 204]; *People* v. *Bullard, supra,* 75 Cal.App.3d at p. 771.)

The statements of Torres are exculpatory as to himself and inculpatory as to Rios. The statements are crucial or devastating to Rios' case[6] because without them there is no independent evidence which implicates Rios in Lord's murder. Carrillo's statements are both exculpatory and inculpatory as to himself. If his statements were properly edited to omit references

---

[6]In the course of colloquy on admissibility of the statements of both Torres and Carrillo, the court observed "And I guess it's the whole case, isn't it?" The prosecutor responded, "Sure."

clearly implicating Rios for the murder they would be inadmissible as not being relevant. Even if they were found to be relevant, because Carrillo is concededly an accomplice,[7] the admission of his testimony would still be insufficient corroboration for conviction as we discuss below. Suffice it to say we do not find the statements admissible under the alternative hearsay exception theory.

## IV

Rios also raises an issue of prosecutorial misconduct claiming there was prejudicial error in the procedure used by the prosecutor; the district attorney put before the jury what is tantamount to crucial direct testimony by questions posed to Torres and Carrillo when he knew both witnesses would refuse to answer any questions; in closing, the prosecutor sought to have the jury consider as substantive evidence his unanswered questions to Torres and Carrillo contrary to the court's instruction that questions are not evidence. Rios contends this conduct further violated his right of confrontation. The People point out Rios did not specifically object to prosecutorial misconduct at trial.

When a defendant complains of prosecutorial misconduct for the first time on appeal we must ask if a timely objection and admonition would have cured the harm. If so, the contention must be rejected; if not, then we must reach the issue whether on the entire record there was such prejudice to cause a miscarriage of justice. (*People* v. *Green* (1980) 27 Cal.3d 1, 27-35 [164 Cal.Rptr. 1, 609 P.2d 468].) Further, "[t]he prosecutor's good faith, or lack of it, is not controlling in determining whether a defendant has been deprived of the right of confrontation . . . ." (*People* v. *Shipe, supra,* at p. 351.)

Based on this record, it would have been futile for Rios to specifically object to prosecutorial misconduct because the district attorney's conduct was sanctioned by the court's erroneous evidentiary ruling. Admonitions regarding the admission of the questions asked and subsequent out-of-court statements of Torres and Carrillo would not have cured the harm. The procedure utilized by the prosecutor was the same type condemned in *People* v. *Shipe, supra,* 49 Cal.App.3d at p. 355, *People* v. *Harris, supra,* 270 Cal.App.2d at pp. 868-869, and *Douglas* v. *Alabama, supra,* 380 U.S. 415 [13 L.Ed.2d 934]. While a prosecutor is not required to accept at face value a witness' refusal to testify or asserted claim of privilege, and he may

---

[7]Neither party challenges the court's ruling Carrillo was an accomplice as a matter of law. In light of the inadmissibility of Carrillo's statements, the court's finding if challenged would be harmless error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People* v. *Martinez* (1982) 132 Cal.App.3d 119, 131 [183 Cal.Rptr. 256].)

compel a witness to refuse or claim the privilege on a question by question basis *(People v. Chandler* (1971) 17 Cal.App.3d 798, 804-805 [95 Cal.Rptr. 146]), " 'he may not, . . . get before the jury what is tantamount to devastating direct testimony.' " *(People v. Barajas* (1983) 145 Cal.App.3d 804, 811 [193 Cal.Rptr. 750], quoting *People v. Shipe, supra,* 49 Cal.App.3d at p. 349.) The district attorney here, with the court's approval, succeeded in getting before the jury a series of leading questions which created the irrefutable inference Rios murdered Lord. Not only were the questions read in evidence in the prosecutor's case in chief, they were stressed in closing argument and the questions asked Torres were reread during jury deliberations. It is reasonably possible the questions asked Torres and Carrillo were treated as evidence which influenced the jury in its decision. The record thus supports prejudice causing a miscarriage of justice.

## V

Rios next contends there was insufficient admissible corroborating evidence to sustain the conviction; the only evidence presented tying him to the Lord murder was the uncorroborated testimony of Ramos, an accomplice, which under section 1111 is insufficient to convict.

Pursuant to section 1111 a conviction may not be based on the uncorroborated testimony of an accomplice. Generally, before section 1111 is applicable, a defendant has the burden of proving a witness is an accomplice by a preponderance of the evidence. *(People v. Tewksbury, supra,* 15 Cal.3d at pp. 963, 968.) Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Accessories (§ 32) in a criminal act are not included in this definition. *(People v. Tewksbury, supra,* at p. 960.) "However, when the prosecution introduces evidence during its case in chief which establishes the accomplice status by a preponderance of the evidence, defendant's burden is satisfied." *(People v. Martinez* (1982) 132 Cal.App.3d 119, 130 [183 Cal.Rptr. 256], citing *People v. Belton* (1979) 23 Cal.3d 516, 523-524 [153 Cal.Rptr. 195, 591 P.2d 485].)

Here, the district attorney introduced evidence establishing Ramos was liable for murder but was granted immunity on the murder charge in exchange for his testimony. Ramos' statements were evidence of his involvement in the planning and commission of the burglary which led to the murder of Lord. This record supports a finding Ramos was an accomplice as a matter of law. *(People v. Martinez, supra,* 132 Cal.App.3d at p. 131.)

■ While the evidence needed to corroborate Ramos' testimony need not be great, there must be some independent evidence which, without aid or assistance from his testimony, tends to connect Rios with the murder of Lord. (§ 1111.) " ' "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense . . . ." ' " (*People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213]) The testimony of one accomplice may not be used to corroborate the testimony of another accomplice. (*People* v. *Boyce* (1980) 110 Cal.App.3d 726, 737 [168 Cal.Rptr. 219]; *People* v. *Scofield* (1971) 17 Cal.App.3d 1018, 1026 [95 Cal.Rptr. 405].)

■ After searching the record in light of these rules, we are unable to find any evidence which, absent Torres' or Carrillo's testimony, connects Rios to the commission of the murder of which he was convicted. Our conclusion appears to be supported by the comments of the prosecutor and judge at trial. Both said if the testimony of Torres was inadmissible there would be no independent evidence to corroborate Ramos' testimony connecting Rios to Lord's murder.

Only the testimony of accomplice Ramos ties Rios to the murder. Arguably, the testimony of Ms. Duffus that she saw a short Mexican-appearing man running toward 27th Street while Ramos testified he ran toward 26th Street would suggest another person being involved in the murder. However, this circumstantial evidence does not connect Rios to the crime; the prosecutor did not attempt to use this testimony to identify Rios. Other independent trial testimony did nothing more than show "the commission of the offense or the circumstances thereof." Rios contends the failure of the prosecution to produce any independent corroborating evidence tending to connect Rios with the murder of Lord, other than the extrajudicial statements of Torres and Carrillo held by us to be inadmissible, requires not only reversal but an acquittal. (*People* v. *Martinez, supra,* at p. 133; *People* v. *Belton, supra,* at p. 527.)

We addressed this issue in *People* v. *Harvey* (1984) *ante,* page 90 [208 Cal.Rptr. 910] and held trial court error in the admission of evidence does not bar a second trial on double jeopardy grounds where other available evidence was not offered by the prosecution in reliance upon the trial court's erroneous ruling. Noting several decisions of the federal circuit courts of appeal allowing retrial after appellate exclusion of erroneously admitted evidence where the remaining untainted evidence was insufficient, we said: "We similarly believe that where a trial court has ruled certain evidence admissible, the prosecutor should be entitled to rely on that ruling in decid-

ing not to introduce other available evidence which might be cumulative, confusing or perhaps not as persuasive. While the prosecution should be encouraged 'to make the best case it can at its first opportunity' [citation], quantity is not synonymous with quality; more evidence does not always make the 'better' case. In addition, as the Supreme Court has noted in another context, 'the prosecution . . . of a lawsuit involves the difficult problem of balancing the effectiveness of any given tactic or procedure against its cost in terms of time and expense.' (*Hocharian* v. *Superior Court* (1981) 28 Cal.3d 714, 720 [170 Cal.Rptr. 790, 621 P.2d 829].) The cost-benefit balancing process engaged in by a prosecutor in deciding whether to pursue a line of testimony or introduce additional evidence may be materially affected by the trial court's ruling on the admissibility of other related evidence. The prosecutor's desire to present a manageable case should not require him to act at his peril.

"Our conclusion is further supported by our perception of the difficulty in distinguishing a reversal based on a 'new' rule—where retrial would be allowed [citation]—from one based on 'existing' rule—where retrial would be prohibited. Whether a given admissibility issue is 'controlled' by existing precedent or requires an 'extension' of current law may lie largely in the eye of the beholder.

"We believe this problem demands clear standards to guide the conduct of prosecutors who may not have the time for academic contemplation which is, to at least some extent, present in appellate chambers. Given the various policy considerations we have articulated, we therefore hold that where reversal of a conviction is premised on trial court error in admitting evidence against the defendant, retrial is not prohibited notwithstanding that the quantum of admissible evidence at trial may have been legally insufficient to sustain a conviction." (*People* v. *Harvey, supra, ante,* at p. 90.)

Estella Padilla testified for the People at the preliminary hearing. She was not called by the prosecutor at the trial. Her testimony linked Rios to Lord's murder.[8] Padilla identified the third person present at the conversation as Kathy Gonzalez. She was not called as a witness.

---

[8]Padilla testified as follows:

"Q. Miss Padilla, sometime after October the 25th of 1982 were you present in the company of the person you have identified as Squid and another person where there was a conversation about a shooting?

"A. Yes.

"Q. And do you recall when that was?

"A. No.

"Q. Do you recall where this conversation was?

"A. Yes. The house I was staying at.

"Q. How many people were present?

"A. In the conversation or in the house?

We need not speculate why the People failed to adduce any trial testimony from Padilla or Gonzalez. We conclude the People if disposed so to do are entitled to the opportunity to endeavor to adduce at least the testimony of Padilla and Gonzalez from which arguably they refrained in reliance upon the admissibility of the tainted corroboration derived from the erroneous admission of the extrajudicial statements of Torres and Carrillo.

## VI

Judgment reversed.

Work, Acting P. J., and Gamer, J.,* concurred.

---

"Q. During the conversation.
"A. About three.
"Q. And were you one of the three?
"A. Well, no, I was just right there.
"Q. Okay. Were you able to hear the conversation?
"A. Yes, I overheard it.
"Q. And was that conversation relative to a shooting that had occurred on 'A' Street?
"A. Yes.
"Q. And can you tell us what you heard the man you identified as Squid say about that shooting on 'A' Street?
"A. Somebody just asked him about it.
"Q. You mean one of the parties present asked him about it?
"A. Yes.
"Q. And what did he respond to it? What did he say?
"A. He just said it was an accident.
"Q. Well, can you tell us what was the question that was posed to Squid?
"A. Somebody just told him, 'That was messed up, about that old man that you killed.'
"Q. And what was his response to that statement?
"A. He just said it was an accident, put his head down. He didn't want to talk about it."
*Assigned by the Chairperson of the Judicial Council.