Filed 10/26/20  P. v. Collins CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CODY RINEHART COLLINS,<br><br>Defendant and Appellant. | F076774<br><br>(Super. Ct. Nos. CRF45964, CRF50931 & CRF52024)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

This appeal arises from three Tuolumne County Superior Court criminal cases. In case No. CRF45964 (hereafter case No. 45964), Cody Rinehart Collins (defendant) was convicted on seven counts arising out of his possession of drugs and weapons, as well as an enhancement under Health and Safety Code section 11370.2, subdivision (c), based on a prior conviction for the possession of a controlled substance for sale. In case No. CRF50931 (hereafter case No. 50931), defendant was convicted of being a felon in possession of ammunition. In case No. CRF52024 (hereafter case No. 52024), defendant was convicted of first degree burglary with another person present, and assault with a deadly weapon, as well as an enhancement for being out on bail at the time the offenses were committed. He was sentenced to an aggregate term of 11 years 4 months.

On appeal, defendant contends his convictions in case No. 52024 must be reversed because the complaining witness's reluctant testimony violated his right to confront the witnesses against him, and the victim's prior hearsay statements were improperly admitted. He also contends, and the People concede, his sentence for assault with a deadly weapon on count II in case No. 52024 must be stayed pursuant to Penal Code section 654. Additionally, defendant argues, and the People concede, the Health and Safety Code section 11370.2 enhancement that was imposed and stayed in case No. 45964 must be stricken.[1] We requested supplemental briefing on the question of whether defendant's conviction for possession of a switchblade knife on count VI in case No. 45964 must be reversed, because the charge was dismissed by the trial court and defendant neither pled to, nor stood trial for, that offense. The People concede count VI must be reversed.

---

[1] In his opening brief, defendant also argued his conviction in case No. 50931 must be reversed because the trial court erroneously took judicial notice of his prior conviction. However, defendant subsequently withdrew this argument, and we therefore do not address it.

In case No. 45964, we reverse defendant's conviction for possession of a switchblade knife on count VI, and we strike the Health and Safety Code section 11370.2 enhancement imposed by the trial court. In case No. 52024, we remand with instructions for the trial court to stay the sentence on count II pursuant to Penal Code section 654. In all other respects, we affirm.

## PROCEDURAL HISTORY

In case No. 45964, defendant was charged with possession of methamphetamine for sale (Health & Saf. Code, § 11378; count I), transportation of methamphetamine for sale (*id*., § 11379, subd. (a); count II), felon in possession of a firearm (Pen. Code,[2] § 29800, subd. (a)(1); count III), felon in possession of ammunition (§ 30305, subd. (a)(1); count IV), misdemeanor possession of a smoking device (former Health & Saf. Code, § 11364.1, subd. (a); count V), misdemeanor possession of a switchblade knife (§ 21510, subd. (b); count VI), and possession of methamphetamine with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count VII), all arising from a traffic stop. He also was charged with Health and Safety Code section 11370.2, subdivision (c) enhancements on counts I and II, based on a 1999 conviction for possession of methamphetamine with the intent to sell (Health & Saf. Code, § 11378, subd. (a)). Defendant eventually pled guilty to counts I through V and VII, as well as both enhancements. As explained below, the court mistakenly noted defendant also pled guilty to count VI, and the court erroneously pronounced judgment on that count.

In case No. 50931, defendant was charged with, and a jury convicted him of, a single count of felon in possession of ammunition (§ 30305, subd. (a)(1)), arising from his entry into the courthouse with a bullet in his pocket. In bifurcated proceedings, defendant admitted an enhancement for being out on bail at the time the offense was committed (§ 12022.1).

---

**2** Undesignated statutory references are to the Penal Code.

3.

In case No. 52024, defendant was charged with, and a jury convicted him of, first degree burglary with the allegation a person other than an accomplice was present (§ 459; count I), and assault with a deadly weapon (§ 245, subd. (a)(1); count II).[3]  In bifurcated proceedings, the court found true two enhancements for being out on bail (in cases Nos. 45964 & 50931) at the time the offenses were committed.

Defendant was sentenced to an aggregate term of 11 years 4 months for all three cases.  In case No. 52024, he was sentenced to the upper term of six years on count I, a consecutive one-year term on count II, and a consecutive two-year term for one out-on-bail enhancement.  The second out-on-bail enhancement was stricken.  In case No. 50931, defendant was sentenced to an eight-month term on the sole substantive count, to be served consecutively to the sentence in case No. 45964.  The out-on-bail enhancement was stricken.  In case No. 45964, defendant was sentenced to a one-year term on count II and an eight-month term on count III, to be served consecutively. Concurrent sentences were imposed on counts IV, V, and VI.  Sentences on counts I and VII, and on one Health and Safety Code section 11370.2 enhancement, were imposed and stayed.

## FACTUAL BACKGROUND

Defendant has withdrawn his challenge to case No. 52024.  The issues presented in case No. 45964 do not involve the underlying factual background.  We therefore limit our discussion of facts to those in case No. 52024.

The charges in case No. 52024 arose from an altercation that occurred between defendant and Juston S., which occurred in the home of defendant's girlfriend, Mellita C.[4]

---

**3** Defendant was also charged with making criminal threats (§ 422, subd. (a); count III), but was found not guilty on this count.

**4** Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

4.

### *The People's Case*

At the time of trial in September 2017, defendant and Mellita had been in a relationship for approximately three years, and were still living together. In late November 2016, Mellita left the house she shared with defendant for a few days because defendant obtained a restraining order against her. Later in November, defendant moved out of the house and Mellita moved back in. In December 2016, defendant was living in the house off and on, leaving when he and Mellita would fight. During that time, defendant and Mellita spoke or saw each other daily.

Juston was friends with both defendant and Mellita. There was conflicting testimony as to whether Juston was staying at Mellita's house in December 2016. Juston testified he was not staying there. Mellita testified he was staying there on and off for about a month and would sometimes sleep in her bed. Juston denied wanting a relationship with Mellita. However, Mellita believed Juston wanted a relationship with her.

The incident at issue here occurred on the morning of December 9, 2016. To Mellita's knowledge, defendant was not in the house the night before. Juston was in the house on the morning of the incident, in Mellita's bedroom. Mellita exchanged text messages with defendant before she left for work around 8:00 a.m. She did not lock the door when she left.

Later in the morning of December 9, 2016, Juston's coworker, Brian C., arrived at Mellita's house to pick Juston up for work. Brian had been picking Juston up at Mellita's house for at least the previous two weeks. When Brian pulled up to the house, Juston came out in his underwear with blood all over his body. Brian followed Juston into the house. According to Brian, Juston reported that "he got in a scuffle with [defendant] in the hallway after [defendant] hit him while he was laying in bed." Juston told Brian that defendant hit him in the head with a rod or some sort of object. Brian told Juston to call the police but Juston did not immediately do so.

5.

Brian was in a hurry to get to a job site, and he ran out of the house, got into the truck, and started to back out. Juston ran out to join him. Brian testified that, while stopped at a nearby intersection, he saw defendant go behind the truck. Juston exited the truck and tried to defend himself. Defendant ran away and Juston pursued him. Juston caught up to defendant and tried to hit him with an uppercut. They fell to the ground and defendant put Juston in a headlock. They eventually separated. Defendant ran off and Juston returned to the truck.

Detective Poel spoke with Juston by phone at approximately 8:40 a.m.[5] Juston reported that he was in bed at Mellita's house at approximately 7:50 a.m. when he heard someone come into the room. He recognized the person as defendant. Defendant swung at him several times with what Juston thought was a golf club, hitting him in the head and arm, and saying, "I told you I was going to get you." Juston chased defendant out of the house and, a short time later, Brian arrived to pick Juston up for work.

Juston told Poel that defendant approached Brian's truck at an intersection and tried to grab Juston through the open window. Juston got out of the truck and defendant punched him in the face. Juston tried to punch back and they ended up on the ground. Defendant got Juston in a choke hold and Juston attempted to strike defendant. Brian intervened and the two were separated.

Poel also spoke with Brian, who reported having heard defendant threaten Juston two times during the encounter by stating, "I am going to kill you," and "I am going to kill you in bed."

Poel later met Juston at the hospital. Poel observed that Juston had bruises and cuts to his left arm, a fattened lip, and an approximately one-inch laceration on top of his

---

**5** Evidence regarding Juston's statements to Poel was introduced through Poel's testimony. As discussed below, Juston generally refused to testify regarding the incident.

head.  In Poel's presence, Juston completed and signed a Violent Crime Form and a Citizen's Arrest Form.

During the day, Mellita received numerous calls and texts from multiple people regarding an incident that occurred at her house.  After work, she met a police officer at her house.  The house was in disarray and showed signs of a struggle, including popcorn on the living room floor, a chair knocked over in the dining room, and her bedding was askew.  Mellita saw blood on a curtain that had separated the kitchen from the dining room.  She saw a fireplace shovel in the hallway.  She saw blood on the comforter that had been on her bed.

A few days later, Poel spoke with Juston again by phone.  Juston reported that he did not hear defendant threaten him during the incident, but believed defendant could act on the threats Brian reported.  Juston believed he was struck with a fireplace ash shovel because such a shovel was found out of place in the home on the date of the incident.

Poel also met with Mellita and Juston at the home.  Mellita reported that Juston had been living at the house for about two months, and that defendant did not have permission to come by whenever he wanted.  She told Poel she found an ash shovel about halfway down the hallway.  Poel took photographs of the house, including a photograph depicting Juston in bed in the position he was in when he was attacked.  Poel took the ash shovel into evidence.  He did not see any blood on it.

### Defense Case

Defendant testified that he lived in the house at issue for about five years, and Mellita moved in at the beginning of 2016.  On the day of the incident, the house was still his residence, but he was also staying with a friend off and on when he and Mellita had relationship problems.

On the morning of the incident, defendant went to the house to pick up his laundry.  He walked there from the house where he was staying, a distance of about three-quarters of a mile.  When he arrived, he went in the unlocked front door, then sat on

7.

the couch and played a game on his phone. Mellita was home and was getting ready for work. She eventually came down the hallway looking at her phone and walked out the front door. They did not make eye contact and defendant did not say anything to her. Defendant continued to play a game on his phone for a minute longer before going to the bedroom to retrieve his laundry. He did not expect anyone else to be in the house.

Defendant walked in the bedroom door and immediately saw someone coming toward him. Defendant grabbed the person to keep him from coming further. The person was holding an object and they "wrassled." Defendant was able to take the object away from the person and then swung it at the person. The object hit the person's arm and flopped out of defendant's hand. Defendant backed up down the hallway and they continued to struggle. By the time they reached the kitchen, defendant realized the person was Juston. Juston picked up part of a chair and defendant kicked it out of his hands. They each threw punches before defendant left through the front door.

Defendant testified that he left the house and ran towards the highway. As he did so, he saw Brian driving toward the house. Soon thereafter, while defendant was still walking back to the house where he was staying, Brian tried to run him over. Defendant jumped out of the way and ran off the road and toward the back of the truck. Brian and Juston exited the vehicle and defendant ran up to the highway, toward a fence he intended to jump to get away from them. Brian and Juston pursued defendant in the truck. Juston got out of the truck and, as he and defendant fought, defendant held Juston down on the ground with his elbow. Brian came around and hit defendant with an uppercut, saying, "Let him go." Defendant let Juston go and continued walking to the house where he was staying. Defendant denied that he threatened Juston's life. He acknowledged that he did not call the police regarding this incident.

## DISCUSSION

### I.    Request to Strike Juston's Testimony

Juston responded to many of the prosecutor's questions by stating, "No comment." Defendant contends his right to confrontation under the Sixth Amendment to the United States Constitution was violated when the court declined to strike Juston's testimony. We conclude defendant had a meaningful opportunity to cross-examine Juston. Accordingly, we find no confrontation clause violation.

#### A.    *Additional Factual Background*

Juston testified as a reluctant witness for the prosecution. One of the first questions asked by the prosecutor was whether Juston knew Mellita. He responded, "I'm not sure, and I think I spoke to somebody or told them that I wasn't going to make no statement. I had nothing to say on this matter so –" However, Juston eventually acknowledged that he had known Mellita for a couple of years. He denied he was staying with her in December 2016. When asked whether he had ever been in her house, Juston responded, "Where are you going with this because I already said I don't have no statement to make?" He also stated, "I am not going to testify against nobody so . . . ."

The prosecutor proceeded to question Juston regarding a form that Juston acknowledged he had signed, in which he circled places on his body where he had been hit. Juston stated that he signed the form "[p]robably because [he] went to the hospital." When asked why he made those circles, he stated, "Sir, I already said I will not testify against [defendant]. I have nothing against him, and that's as far as I want to go with that. I don't believe this even should have came to this matter. So I don't even know why we're in here. I talked to the DA about this when you guys served me." The following exchange occurred:

> "Q    Okay. Let me show you four photographs that have been marked as Exhibit Number 2.
>
> "A    That's fine. I've seen these.

9.

"Q      Those are pictures of you taken at the hospital, weren't they?

"A      I believe so, yes.

"Q      Pictures of you with marks on your head, right, like wounds? Are those pictures of you with wounds on your head?

"A      They are – I don't recall.

"Q      You don't recall?

"A      No.

"Q      Well, you don't recall the day that a police officer came and took pictures of you when you were at the hospital?

"A      Sure.  I talked to them.  Like I said, I don't have no statement to make about them.  This guy is going through enough.  I don't believe he deserves to be going through all of this.

"Q      Okay.  So you talked to the officer, and you told the officer that on the morning of December 9th at 7:50 in the morning, you were lying on the bed at Mellita's house.  Do you remember telling the officer that?

"A      No comment.

"Q      I'm sorry?

"A      No comment.

"Q      No comment?

"A      Nope.

"Q      Well, are you saying you didn't?

"A      I am saying no comment.

"Q      Okay.  You told the officer at the hospital that Mellita had left for work and wasn't at home?

"A      Once again, no comment.

"Q      You told the officer that you heard someone coming into the room?

10.

"A      Once again, no comment.

"Q      You told the officer that you recognized that someone is [defendant]?

"A      No comment."

Juston then identified defendant in court, although with some reluctance.  He testified he had known defendant for three to four years.

Juston acknowledged that a photograph presented by the prosecutor showed Juston on the bed in Mellita's house.  When the prosecutor asked whether Juston had been in Mellita's bedroom before, Juston responded, "I said that I know both of them, so, yeah," and later responded to the same question with, "No comment."

The prosecutor proceeded to ask Juston a series of questions regarding whether he made certain statements to the police:

"Q      So the morning of December 9th you told the sheriff's deputy that [defendant] came in that bedroom.  Do you remember telling the cops that?

"A      No comment.  [¶] . . . [¶]

"Q      All right.  Do you remember telling a deputy at the hospital that when [defendant] came in the room he swung something at you?

"A      No comment, one more time.

"Q      And do you remember – did [Mellita] tell you later that night that she found an ash shovel in the hallway?  Do you remember her telling you that?

"A      No comment.

"Q      And do you remember telling the sheriff's deputy that [defendant] swung something at you, and you blocked the first blow with your arm?

"A      No comment.

11.

"Q     On that Exhibit 1 where you signed your name and you circled pictures, how come you circled the injuries to your arm, was that from blocking this thing?

"A     No comment.

"Q     And then you told the deputy that you got hit on the head with something the second time [defendant] swung at you, do you remember saying that?

"A     Nope, no comment.

"Q     Now you're saying no comment because [defendant] has been through enough, and you just don't want to see him get in more trouble?

"A     No, I'm saying that I am saying no comment for the simple fact I have nothing against this guy, and no comment because I have no ill will towards him.  No comment.

"Q     So for you, he swung at you, and he hit you on the head with this shovel, for you that's sort of in the past, water under the bridge, no big deal; fair statement?  [¶] . . . [¶]

"A     No comment.

"Q     Do you remember telling the deputy that he took more swings at you and missed you?

"A     I don't recall.  I am going to say no comment.

"Q     Do you remember telling the deputy that [defendant], after he got done, said to you, 'I told you I was going to get you'?

"A     I don't recall.  No comment.

"Q     Do you remember telling the deputy that you chased him out of the house?

"A     No comment."

Juston then testified that he and Brian worked together for a painting company, and that Brian would give him rides to work.  The prosecutor asked, "So the morning that [defendant] hit you on the head with some object, do you remember running out of your house with blood streaming down your head and telling Brian, 'My God, [defendant] just

12.

hit me'?" Juston responded, "I have no comment." Juston continued to respond with a variation of "no comment" regarding whether he made other statements to law enforcement:

"Q Now, when you and Brian drove to the job site, whose idea was it that you call the police and talk to somebody on the phone? Was that your idea, Brian's idea?

"A No comment, on that.

"Q And you told the deputy that while you and [Brian] were waiting for traffic at [the intersection], that [defendant] tried to grab you out of the car. Do you remember telling the deputy that?

"A No comment.

"Q Do you remember telling the deputy that you opened the door and got out?

"A No comment.

"Q Do you remember telling the deputy that [defendant] punched you in the mouth with a closed fist?

"A I have no comment.

"Q Do you remember telling the deputy that you punched back, and it kind of got into a fight with him?

"A Sir, I am done here.

"Q Is that a no comment?

"A I am not making no more statements. I am done with this hearing. So I am ready to go back."

After being advised by the court that he could answer the questions however he felt he should, but was required to answer, Juston stated, "no comment." Questioning then continued:

"Q Do you remember telling the deputy when you and him went to the ground that he got you in a choke hold?

13.

"A      No comment.

"Q      Do you remember telling the deputy that [Brian] got him off of you?

"A      No comment.

"Q      Do you remember telling the deputy that [defendant] then left the scene?

"A      No comment."

Juston then responded by stating he did not recall making certain statements:

"[Q]   Do you remember telling a deputy that you felt threatened by [defendant] when you heard that he was going to kill you?

"A      No, I don't recall that.

"Q      Okay.  Why did you tell a deputy that you thought maybe [defendant] had been hanging around the house the night before he hit you with whatever he hit you with?  Why did you tell the cops that?

"A      I don't recall telling the cops that, and, yeah, I don't recall saying that."

Juston testified that he spoke with defendant two to three times between December 2016 and trial, to discuss having a barbecue and recalling "the good old times."  They did not discuss his testimony, and Juston stated he was not afraid of defendant.  Juston reiterated that he had no ill will toward defendant.

When the prosecutor asked whether anyone forced Juston to make the statements he made to the deputy, Juston responded by explaining that "[t]his was almost a year ago" and therefore "hard to recall" and, in any event, was not something he cared about.  When asked whether he wanted to have a relationship with Mellita, Juston stated, "I am not going to say I did, no."  When asked why he was at Mellita's house on the morning of the incident, Juston stated, "No comment."  When asked how he got a fat lip, Juston stated, "I must have bumped my friend's door when I got in the truck to get to work."

On cross-examination, the following exchange occurred:

"Q     [Juston], you do not want to testify today; right?

"A     Correct.

"Q     And you do not want to testify today because you lied to the cops about what really happened that day; isn't that right?

"A     I am not going to say that and put myself in perjury or nothing like that. I have no comment on the situation because I don't want to testify. I don't have no ill will towards [defendant]. So with that, I don't feel that he should be getting tried for this. I don't think that he's a bad guy. I don't think he deserves to get in trouble for this. Really, I have no ill will for him and – [¶] . . . [¶]

"Q     You don't want to testify today because it was, in fact, you who went after [defendant] first; isn't it?

"A     I am not saying that either.

"Q     You do not want to testify today because you don't want to get yourself in trouble; right?

"A     No, I am not saying that. Do you want me to testify? Are you his attorney?

"Q     I am his attorney.

"A     Okay. So I am sure you probably don't want me to testify. Aren't you fighting for him? I think if we can convince the jurors that I have no ill will towards this man and that should be obvious."

At that point, the prosecutor objected on the ground the response was nonresponsive, and the court sustained the objection. Juston then stated, "Okay. Ma'am, I have no comment." Defense counsel ceased further questioning.

The following morning, defense counsel asked the court to strike Juston's testimony because his general refusal to testify denied the defense an opportunity to cross-examine him. Defense counsel also sought to prohibit the prosecution from impeaching Juston with statements he may have made to law enforcement.

In response, the prosecutor seemed to imply that the right of confrontation did not apply because Juston felt favorably toward defendant and therefore was not a "witness

15.

testifying against" defendant. The prosecutor pointed out that defense counsel did not object to any of the prosecutor's questions attempting to impeach Juston with prior statements to the police. The prosecutor also argued that defense counsel had a meaningful opportunity to cross-examine Juston but "didn't like the answers that she got."

The court denied the motion to strike Juston's testimony and to disallow impeachment with prior statements because "[Juston] answered some questions which were subject to impeachment, and there were no objections by [defense counsel] as to any of the answers that [Juston] gave on direct examination." The court also noted that defense counsel had an opportunity for cross-examination, in which Juston's statement, "So I am sure you probably don't want me to testify. Aren't you fighting for him?" created an inference that his trial testimony was inconsistent with statements made to law enforcement.

Defense counsel moved for a mistrial based on her own ineffective assistance in failing to object to Juston's testimony. The motion was denied.

Prior to Poel's testimony, defense counsel asked that Poel be limited to testifying to matters on which the prosecutor had questioned Juston. The court determined that Juston's refusal to answer questions "opens up everything" because he "implicitly refute[d] everything that he might have said to this officer." Additionally, Juston's statement on cross-examination indicating that defense counsel would not want him to testify was "implicitly inconsistent" with his responses to the prosecutor, and "probably consistent" with the statements he gave to Poel. Accordingly, the court concluded "the door has been opened completely for purposes of impeachment." Defense counsel lodged a continuing objection to Poel's testimony regarding Juston's prior statements.

### B. Applicable Law

We review de novo the issue of whether testimony or evidence violated defendant's rights under the confrontation clause. (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964.)

Both the United States and California Constitutions guarantee the right of criminal defendants to confront and cross-examine witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art I, § 15; *United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*); *People v. Carter* (2005) 36 Cal.4th 1114, 1172.) " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " (*Davis v. Alaska* (1974) 415 U.S. 308, 315–316, italics omitted.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . . [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness." (*Id.* at p. 316.) However, " '[t]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." ' " (*Owens*, at p. 559.)

A witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*People v. Rios* (1985) 163 Cal.App.3d 852, 864 (*Rios*); see *Douglas v. Alabama* (1965) 380 U.S. 415, 420 (*Douglas*) [holding the confrontation clause was violated where witness refused to answer any questions].) A witness's refusal to answer some questions while otherwise testifying at length will generally satisfy the constitutional right to confrontation, so long as " '[his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements.' " (*People v. Homick* (2012) 55 Cal.4th 816, 861 (*Homick*).) Similarly, "a witness who

17.

suffers from memory loss—real or feigned—is considered 'subject to cross-examination' because his presence and responses provide the 'jury with the opportunity to see [his] demeanor and assess [his] credibility.' " (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1391 (*Foalima*); see *Owens*, *supra*, 484 U.S. at pp. 559–560 [the opportunity for cross-examination is not denied where witness suffers from memory loss].)

### C.    Analysis

Defendant contends his Sixth Amendment right to confrontation was violated by Juston's refusal to testify, and his testimony therefore should have been stricken.

*Douglas* is the leading case interpreting the confrontation clause in the context of a witness who refuses to testify. There, the defendant was tried for assault, and the state called as a witness a man who had been indicted with the defendant and found guilty in a separate trial. (*Douglas*, *supra*, 380 U.S. at p. 416.) The trial court ruled the witness did not have a valid claim of Fifth Amendment privilege, but the witness nonetheless refused to answer any questions on direct- or cross-examination. (*Id.* at pp. 416, 419.) During questioning, the prosecutor was permitted to read portions of a written confession previously signed by the witness, which implicated the defendant in the assault. (*Id.* at pp. 416–417.) The United States Supreme Court held that the use of the witness's prior statement violated the defendant's rights under the confrontation clause. (*Id.* at pp. 419–420.) Although the prosecutor's reading of the witness's alleged statement and the witness's refusals to answer were not technically testimony, the Supreme Court noted that "the jury might improperly infer both that the statement had been made and that it was true," without the defendant having the opportunity to test the credibility of such inferences through cross-examination. (*Ibid.*)

California cases have relied on *Douglas* to find a defendant's right to confrontation is violated where, in examining a recalcitrant witness, the prosecutor poses leading questions providing the details of prior statements a witness made to law enforcement regarding a defendant's commission of a crime. In *People v. Murillo* (2014)

231 Cal.App.4th 448, a victim-witness refused to answer " 'nearly all questions asked by counsel for both sides and by the court.' " (*Id*. at p. 452.) The prosecutor posed over 100 leading questions regarding the witness's prior statement to police, but the witness repeatedly stated he had "nothing to say" or did not respond. (*Id.* at pp. 451, 456.) The Court of Appeal concluded the statements violated the confrontation clause in light of the lack of effective cross-examination. (*Id*. at p. 456.) Similarly, in *Rios* the court found the admission of a prior statement made by a witness who refused to answer any question on direct or cross-examination denied the defendant a meaningful opportunity for cross-examination, and thereby denied him the right to confrontation. (*Rios*, *supra*, 163 Cal.App.3d at pp. 863–865.)

However, " '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' " (*Owens*, *supra*, 484 U.S. at p. 558.) Thus, when a witness has refused to answer some, but not all questions, courts have generally declined to find a confrontation clause violation. For example, in *Homick* an accomplice was called to testify against the defendant at trial. (*Homick*, *supra*, 55 Cal.4th at p. 855.) The accomplice claimed his previous statements admitting his participation in the charged murders were coerced; he also asserted a lack of memory, refused to answer questions, "and generally behaved in an uncooperative and childish manner." (*Ibid*.) Our Supreme Court held that such testimony did not violate the defendant's right to confrontation: "While his refusal to answer defendant's counsel's questions 'narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and

whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.' " (*Id.* at p. 861.)

Likewise, when a witness presents for cross-examination but claims memory loss, whether real or feigned, the confrontation clause generally is not violated. For example, in *Owens*, the United States Supreme Court held that the defendant's confrontation rights were not violated where the witness testified to an out-of-court identification but could not explain the basis for that identification due to memory loss. (*Owens, supra*, 484 U.S. at pp. 559–560.) Similarly, in *Foalima*, a witness against the defendant responded, "I don't know" or "I don't remember" to most of the prosecutor's questions. (*Foalima, supra*, 239 Cal.App.4th at p. 1388.) On cross-examination, defense counsel asked only one question: "If I ask you any questions are you going to know anything?" (*Id.* at p. 1389.) The witness responded, "No." (*Ibid.*) The Court of Appeal held that the witness's testimony did not violate the defendant's right of confrontation, despite the witness's claimed lack of recall. (*Id.* at pp. 1391–1392.)

Turning to the facts of the instant case, we first note that Juston did not refuse to answer questions posed by defense counsel. Defense counsel asked Juston four questions, and Juston responded to each of them. When asked whether he wanted to testify, Juston confirmed that he did not. When asked whether he "lied to the cops about what really happened that day," Juston stated, "I am not going to say that," and explained that he had no ill will toward defendant and did not feel defendant should have to stand trial or get in trouble. When asked whether he "went after" defendant, Juston stated, "I am not saying that either." And, when asked whether he was reluctant to testify because he did not want to get himself in trouble, he suggested defense counsel would not want him to testify. When the prosecutor objected that this answer was nonresponsive, the court sustained the objection and Juston answered, "Okay. Ma'am, I have no comment." Defense counsel then voluntarily ceased further questioning.

This is not a circumstance where defense counsel's questioning of Juston was curtailed by law or by the trial court, or even by Juston's reluctance to testify. Rather, it appears that defense counsel strategically chose not to pursue further cross-examination because such testimony was likely to be harmful to defendant. Such voluntary and strategic cessation of questioning does not give rise to a confrontation clause violation. (See *Foalima*, *supra*, 239 Cal.App.4th at p. 1392 [holding that the defendant had not been denied his right to cross-examine recalcitrant witness, where the defendant declined an opportunity for further cross-examination]; see also *Dorsey v. Chapman* (11th Cir. 2001) 262 F.3d 1181, 1190 [declining to find a confrontation clause violation where the defendant "was not prohibited from pursuing any line of inquiry, but strategically chose not to"].)

Furthermore, Juston's presence at trial as a testifying witness gave the jury the opportunity to assess his demeanor and credibility; to determine the weight, if any, to give his prior statements; and to evaluate Juston's proffered reasons for declining to testify regarding the incident. (See *Homick*, *supra*, 55 Cal.4th at p. 861.) Unlike a witness who refuses to testify or respond to any questions, Juston testified at length, and explained in detail the reasons behind his reluctance to testify against defendant. Juston's responses to cross-examination gave defendant a full and fair opportunity to expose infirmities in Juston's testimony and his prior statements. (See *Owens*, *supra*, 484 U.S. at p. 558.) Although Juston ultimately did not implicate himself in the assault or admit that his prior statements were false, the " 'Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." ' " (*Owens*, *supra*, 484 U.S. at p. 559.) Defense counsel's inability to extract the responses she desired of Juston does not, in itself, suggest defendant's confrontation rights were violated.

In sum, we conclude the confrontation clause was satisfied, despite Juston's selective memory and evasiveness, because " '[his] presence at trial as a testifying

21.

witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements.' " (*Homick*, *supra*, 55 Cal.4th at p. 861.)

## II. Admission of Juston's Hearsay Statements to Law Enforcement

Poel was permitted to testify to Juston's prior hearsay statements pursuant to Evidence Code section 1235, which permits the admission of prior statements that are inconsistent with a witness's trial testimony. (Evid. Code, § 1235.) Defendant contends Juston's prior statements were not inconsistent with his trial testimony, and therefore they were not properly admitted. We disagree.

Evidence Code section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code s]ection 770."[6] "Evidence Code section 1235 does not require an express contradiction between the testimony and the prior statement" before the prior statement may be deemed inconsistent. (*In re Bell* (2017) 2 Cal.5th 1300, 1307.) Instead, Evidence Code section 1235 requires "inconsistency in effect." (*In re Bell*, at p. 1307.) A statement is inconsistent for purposes of Evidence Code section 1235 "if it has ' "a tendency to contradict or disprove the [witness's trial] testimony or any inference to be deduced from it." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 502 (*Cowan*).) We review the trial

---

[6] Evidence Code section 770 provides:

"Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

22.

court's decision regarding admissibility of a prior statement under Evidence Code section 1235 for abuse of discretion.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 723.)

A complete refusal to answer any questions generally will not support a determination of inconsistency under Evidence Code section 1235 because, in that situation "there is simply no 'statement' in the record which is inconsistent, or for that matter consistent, with prior statements."  (*Rios*, *supra*, 163 Cal.App.3d at p. 864.) "However, a witness's deliberate evasion of questioning can constitute an implied denial that amounts to inconsistency, rendering a prior statement admissible under Evidence Code section 1235."  (*Cowan*, *supra*, 50 Cal.4th at p. 463; accord, *Homick*, *supra*, 55 Cal.4th at p. 859 ["[U]nder the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeachment under Evidence Code section 1235."].)

"Normally, the question of evasiveness arises when a witness claims memory loss about the subject of the questioning."  (*Cowan*, *supra*, 50 Cal.4th at p. 463.) " 'Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event.  [Citation.]  When, however, "a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied." ' " (*People v. Anderson* (2018) 5 Cal.5th 372, 403; accord, *Homick*, *supra*, 55 Cal.4th at pp. 859–860; *People v. Johnson* (1992) 3 Cal.4th 1183, 1219.)  As long as there is a reasonable basis in the record to conclude the claimed lack of memory is a deliberate evasion, admission of a prior statement is appropriate.  (*People v. Johnson*, at pp. 1219–1220.)

It is not unusual for a court to find sufficient basis for inconsistency under Evidence Code section 1235, when a witness testifies to some details, but strategically forgets or declines to testify to others.  For example, in *People v. Green* (1971) 3 Cal.3d 981 (*Green*), the defendant was accused of furnishing marijuana to a minor, and the chief witness against him was the minor to whom the marijuana was allegedly furnished.  (*Id.*

23.

at pp. 984–985.) The witness testified in detail at the preliminary hearing regarding the quantity and location of the marijuana the defendant asked the witness to pick up and sell. (*Id*. at p. 986.) The witness also made a statement to an officer regarding marijuana the defendant asked to bring to, and did bring to, the witness. (*Ibid*.) At trial, the witness testified to some details before his testimony became "curiously vague" and he claimed lack of recall regarding the events he previously testified to or reported. (*Id*. at pp. 986–987.) Our Supreme Court characterized the witness's equivocations as "inherently incredible." (*Id*. at p. 988.) Ultimately, the high court concluded the witness's deliberate evasion constituted an implied denial that the defendant furnished him with marijuana, which was materially inconsistent with his prior statements. (*Id*. at p. 989.) On these facts, the high court determined that the witness's prior statements were properly admitted under Evidence Code section 1235. (*Green*, at p. 989.)

Similarly, in *In re Deon* (1989) 208 Cal.App.3d 953, 961, the Court of Appeal relied on *Green* to conclude that a witness's blatant refusal to answer specific questions was materially inconsistent with an incriminating statement the witness made to police. Likewise, in *Homick* our Supreme Court relied on *Green* and *In re Deon* to conclude that a witness's "refusal to answer questions was part of his pattern of either repudiating his prior statements as lies or as coerced, or pretending not to remember them," and that his refusal could therefore be deemed inconsistent in effect with his prior statements. (*Homick*, *supra*, 55 Cal.4th at p. 860.)

Here, Juston did not completely refuse to answer questions, and this is therefore not a circumstance in which "there is simply no 'statement' in the record which is inconsistent, or for that matter consistent, with prior statements." (*Rios*, *supra*, 163 Cal.App.3d at p. 864.) To the contrary, Juston answered many of the questions posed by the prosecutor and, to some extent, all the questions posed by defense counsel. He answered at least three questions posed by the prosecutor by stating he did not recall making certain statements regarding the incident to law enforcement. With respect to the

24.

prosecutor's remaining questions regarding the incident, Juston generally responded with, "No comment." Juston repeatedly explained that he would not comment on the incident because he had nothing against defendant and did not think defendant should be prosecuted. On cross-examination, Juston reiterated that he had no ill will toward defendant and did not think defendant should be tried for the offenses, and wished to convince the jurors of same. It is beyond dispute that Juston's claimed lack of recall and his lack of comment were deliberately evasive. (See *Green*, *supra*, 3 Cal.3d at pp. 988–989.) The trial court did not abuse its discretion in concluding that Juston's prior statements to Poel were inconsistent with this deliberately evasive testimony.

Finally, defendant contends Poel's testimony regarding Juston's prior statements should have been strictly limited to those statements that were expressly inconsistent with Juston's trial testimony and those statements for which Juston professed a lack of recall at trial. However, for the reasons stated above, Juston's responses of "no comment" were sufficient to give rise to an implied inconsistency in the circumstances presented here. Moreover, defendant does not identify any specific content from Juston's prior statements that should have been excluded.

Accordingly, we conclude the trial court did not abuse its discretion in admitting Juston's prior statements to Poel.

## III. Sentence for Assault with a Deadly Weapon

In case No. 52024, defendant was convicted of first degree burglary with an allegation a person other than an accomplice was present, and assault with a deadly weapon. The felony at issue in the burglary was assault with a deadly weapon, and the jury was so instructed. The court sentenced defendant to a term of six years for burglary and an additional one-year term for assault with a deadly weapon, to be served consecutively.

Defendant argues, and the People concede, that his sentence for assault with a deadly weapon must be stayed under section 654 because the burglary conviction was

25.

premised on his intent to commit the assault. We agree. Section 654 generally prohibits a court from sentencing a defendant for both a burglary, and for the predicate offense of that burglary. (See *People v. Price* (1991) 1 Cal.4th 324, 492 [holding the court erred under § 654 in imposing punishment for both a murder and a burglary with intent to commit murder, "both offenses being part of a single indivisible transaction"]; *People v. Centers* (1999) 73 Cal.App.4th 84, 98 ["[O]rdinarily, if the defendant commits both burglary and the underlying intended felony, Penal Code section 654 will permit punishment for one or the other but not for both."].)

Accordingly, we will direct the trial court to stay the sentence for assault with a deadly weapon on count II in case No. 52024.

## IV.     Enhancement in Case No. 45964

In case No. 45964, defendant admitted one prior conviction enhancement under Health and Safety Code section 11370.2 to each of counts I and II, based on a prior conviction for possession of a controlled substance for sale (Health & Saf. Code, § 11378, subd. (a)). At sentencing, the trial court stated, in discussing count II, "the Court will strike that pursuant to Section 1385 as the change in the law will prohibit imposition of that sentence as of January 1st, and the defendant will be entitled to relief . . . pursuant to [*In re*] *Estrada* [(1965) 63 Cal.2d 740] should the Court pronounce that sentence." The court's minute order reflects that the court imposed and stayed the sentence on one Health and Safety Code section 11370.2 enhancement, and struck the other. The abstract of judgment reflects that the court imposed and stayed a Health and Safety Code section 11370.2 enhancement on count III.[7]

Effective January 1, 2018, Senate Bill No. 180 (2017-2018 Reg. Sess.) (Senate Bill No. 180) amended Health and Safety Code section 11370.2 to remove "a number of prior convictions from the list of prior convictions that qualify a defendant for the

---

**7**      No such enhancement was alleged or admitted with respect to count III.

26.

imposition of an enhancement under [Health and Safety Code] section 11370.2, subdivision (c)." (*People v. Millan* (2018) 20 Cal.App.5th 450, 454 (*Millan*); see Stats. 2017, ch. 677, § 1.) A conviction for violating Health and Safety Code section 11378 is "[a]mong those convictions that no longer serve to qualify a defendant for an enhancement under Health and Safety Code section 11370.2, subdivision (c)." (*Millan*, at p. 454.) Thus, "the amendment to Health and Safety Code section 11370.2, subdivision (c) lessens punishment for a person . . . whose prior convictions no longer qualify for the three-year Health and Safety Code section 11370.2, subdivision (c) enhancement." (*Id*. at pp. 455–456.)

Although sentencing in this case was conducted in December 2017, the court recognized the impending applicability of Senate Bill No. 180 and endeavored to strike the Health and Safety Code section 11370.2, subdivision (c) enhancements. It appears there was an error in reducing the oral pronouncement of judgment to writing, and an enhancement was mistakenly imposed on count III. Regardless, the People concede that Senate Bill No. 180's amendment to Health and Safety Code section 11370.2, subdivision (c) applies here because the judgment is not yet final. (*Millan*, *supra*, 20 Cal.App.5th at pp. 455–456 [Senate Bill No. 180 amendment applies to cases pending on appeal]; see *In re Estrada*, *supra*, 63 Cal.2d at p. 742 [a defendant whose judgment is not yet final may take advantage of a change in the law that reduces the punishment for a particular offense].) Defendant's prior conviction for violating Health and Safety Code section 11378 no longer qualifies for imposition of an enhancement under Health and Safety Code section 11370.2, subdivision (c).

Accordingly, we will strike the Health and Safety Code section 11370.2 enhancement imposed in case No. 45964.

## V. Conviction on Count VI in Case No. 45964

In case No. 45964, the court erroneously pronounced judgment and sentenced defendant on count VI, possession of a switchblade knife. As we explain, this count was dismissed by the court following the preliminary hearing.

On December 18, 2014, the People filed a complaint charging defendant with seven counts, including count VI, misdemeanor possession of a switchblade knife (§ 21510, subd. (b)). Subsequently, on January 2, 2015, a preliminary examination was held, and the People filed a first amended complaint, later deemed an information, once again charging defendant with seven counts, including count VI, misdemeanor possession of a switchblade knife. Thereafter, defendant filed a motion to set aside the information pursuant to section 995. The court granted the motion in part and set aside count VI.

On March 14, 2016, defendant pled guilty to the remaining charges in case No. 45964. At the plea hearing, defense counsel specifically reminded the court that count VI had been dismissed. The People concurred. No plea was entered as to this count. The court's minute order from that date reflects that defendant pled guilty to counts I through V and VII. Count VI was not listed on the minute order as a pending charge.

For unknown reasons, the minute order for the March 14, 2016 hearing was amended on April 26, 2016. The amended minute order lists count VI as a pending charge, and includes count VI as a charge for which defendant pled guilty. Minute orders from April 25, 2016, forward state that defendant was convicted on count VI based on a guilty plea entered on March 14, 2016.

On May 4, 2016, defendant was permitted to withdraw his plea. Nonetheless, the court's subsequent minute orders for the duration of this case continued to list all seven charges, including count VI, as convictions for which defendant pled guilty on March 14, 2016.

28.

On June 13, 2016, defendant once again pled guilty to counts I through V and VII. Count VI was not mentioned in the court's plea colloquy. Nor was it listed as a pending charge in the advisement and waiver of rights form defendant completed upon entering his guilty plea. The court's minute order from the June 13, 2016 plea hearing once again listed count VI, and all the other counts, as convictions for which defendant pled guilty on March 13, 2016.

On July 21, 2016, defendant's counsel was sanctioned and relieved as counsel of record after he repeatedly failed to appear for court appearances. It does not appear that defendant's newly appointed counsel realized defendant had erroneously been convicted on count VI based on a plea that he did not enter.

Ultimately, count VI was listed in the probation report as a conviction for which defendant pled guilty on March 14, 2016, and the probation department suggested defendant be sentenced to a six-month term on this count, to be served concurrently with the term in count II. Defendant was sentenced on December 11, 2017. The court orally imposed a six-month concurrent term for the offense of possession of a switchblade knife, which the court mistakenly identified as count V. The court's minute order pronounced judgment on count VI, possession of a switchblade knife, and imposed a six-month concurrent term for that offense. The offense, a misdemeanor, was not included in the abstract of judgment.

In sum, count VI was dismissed by the court and was never reinstated. Defendant did not, on March 14, 2016, June 13, 2016, or any other date, enter any plea with respect to the offense of possession of a switchblade knife. Yet, since March 14, 2016, defendant has stood convicted of this offense, for which he was not charged, did not plead guilty, and was not tried.

The conviction on count VI must be reversed.

## DISPOSITION

The conviction on count VI (§ 21510, subd. (b)) in case No. 45964 is reversed. The enhancement imposed pursuant to Health and Safety Code section 11370.2, subdivision (c) in case No. 45964 is stricken. The matter is remanded with instructions for the trial court to stay the sentence on count II (§ 245, subd. (a)(1)) in case No. 52024 pursuant to section 654. Following further proceedings consistent with this opinion, the trial court shall issue an amended abstract of judgment and forward it to the appropriate authorities. In all other respects, the judgment is affirmed.


                                        DE SANTOS, J.

WE CONCUR:


MEEHAN, Acting P.J.


SNAUFFER, J.

30.