Filed 1/19/22  P. v. Williams CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B307946 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA077466) |
| v. | |
| JESSE MARLON WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shannon Knight, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Jesse Marlon Williams appeals from a judgment entered after the jury convicted him as an aider and abettor of attempted premeditated murder, three counts of assault with a firearm, and shooting at an inhabited dwelling. Williams contends the trial court violated his Sixth Amendment right to confront and cross-examine the shooter, James Jones, by admitting Jones's prior statements to detectives incriminating Williams. Jones's statements were admitted after Jones testified Williams was innocent on direct examination, but then refused to answer questions on cross-examination. Williams also argues the trial court abused its discretion by admitting evidence that he was a high-ranking gang member. Williams further asserts the trial court abused its discretion by denying his motion for a new trial based on Jones's letter to defense counsel after trial in which he denied Williams's involvement in the shooting. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution Case*

1. *The day before the shooting*

In August 2019 Dynnell Pugh[1] lived with his fiancée, Malkia Hunt, their son, Dynnell Jr., Hunt's mother, Maranita Porter, Hunt's nieces, Ramaiya and Kamareya, and others. On August 20 Williams, his girlfriend, and his daughter, Nevaeh, went to Pugh and Hunt's house to speak with Porter about a dispute between Nevaeh and Ramaiya. Porter agreed with Williams that the girls' issue "need[ed] to be squashed." Before

---

[1] After he was granted immunity, Pugh testified about the events leading up to the shooting and the shooting.

2

Williams left, he told Porter, "I don't want no problems.  I got people."

> 2.  *The shooting*

At approximately 7:00 p.m. the next day, Hunt answered the door and saw five people outside.  A woman in the group told Hunt that she wanted Ramaiya to come outside to fight.  Hunt responded that Ramaiya was not going to come outside, and Hunt asked the group to leave.  Hunt went to the kitchen and told Porter and Pugh about the group outside their house.  Pugh looked at his security monitors and saw Jones and a group of four females.[2]  He retrieved a gun from his safe and placed it in his right pants pocket before walking outside.  Jones told Pugh that Ramaiya had gotten into a fist fight with Nevaeh and the group wanted Ramaiya to come outside to fight.  Pugh replied there would be no fighting at his home, and he asked them to leave.

A few minutes later, Williams joined the group outside the house.[3]  Williams told Pugh that he wanted Ramaiya to come outside and fight either Nevaeh or the other females in the group.

---

[2]  Pugh and Hunt's house had multiple security cameras and monitors.  At trial, the jury saw video footage of the August 21, 2019 incident from a security camera above the front door.  Hunt and Pugh did not know Williams, Jones, or anyone else in the group prior to August 21.  Porter met Williams and Nevaeh for the first time on August 20, and she did not recognize the other people in the group.

[3]  Security video footage played to the jury (exhibit 5) showed Williams arrived in a black car he parked around the corner from the house.

Pugh responded that no fight was going to happen, and he repeatedly asked Williams and his group to leave.

During the course of Pugh's conversation with the group, Porter and then Hunt joined Pugh outside the house. When Hunt walked outside, the group asked Pugh who Hunt was, and whether she could fight. Pugh motioned to Hunt and Porter and suggested they all go back inside the house. As Pugh backed away from the group, Jones walked "around to [Pugh's] flank" (Pugh's left side). At this point, Jones pulled out his gun and pointed it at Pugh, and Pugh heard Williams say, "Blow his mother fucking head off."[4] Pugh then pulled out his gun from his pants pocket and pointed it at Jones. Jones shot at Pugh, and Pugh fired back at him. Jones and Williams ran off and left together in Williams's vehicle.

Pugh subsequently contacted an attorney friend for advice. The attorney advised Pugh to report the incident to law enforcement but not to disclose that Pugh had a gun because "they'll find out about that later after the investigation." Pugh transferred the security camera recording of the incident onto his cell phone and sent the video to the attorney. Pugh did not call 911 until approximately an hour and a half later. Los Angeles County Sheriff's deputies arrived at Pugh's house four to five hours later and spoke to Pugh on the front lawn for 15 minutes.

---

[4]    Hunt testified that right before the shooting she heard Williams say, "I'm not scared of him. I'll blow his fucking head off," referring to Pugh. Porter testified Williams said something to Jones before Jones reached into his pants pocket, but she could not recall what Williams said. Security video footage played for the jury (exhibit 1) shows the confrontation outside the house and the shooting, but it has no audio.

The deputies wanted to see the security camera footage, but Pugh told them he forgot his password. Pugh did not tell the deputies that he had a video of the incident on his cell phone.

### 3. *The investigation*

Los Angeles County Sheriff's detectives subsequently interviewed Pugh, Hunt, and Porter about the shooting. Detective Andrew Chappell first interviewed Pugh on August 27, at which time Pugh did not mention he had a gun on him during the incident. When Hunt in her September 1 interview disclosed this information, Detective Chappell reinterviewed Pugh, who admitted he had returned fire.

On September 1, 2019 Hunt identified Williams from a six-pack photographic lineup. She wrote below Williams's photograph, "This is the guy that told Dynnell he would blow his head off but is not the shooter." Hunt told the detectives that the man who said "I'll blow his fucking head off" wore glasses and had tattoos.[5] Porter also identified Williams from a six-pack photographic lineup and wrote under Williams's photograph,[6] "This person asked who Malkia was to Dynnell. This person is

---

[5] Williams contends Hunt was referring to Jones as the declarant, who has facial and neck tattoos and wore glasses during the shooting. But Hunt testified both Williams and Jones wore glasses during incident. Further, Williams admitted in his motion for new trial that he also has tattoos, although he asserted Jones's tattoos are more prominent because Jones has facial tattoos (Williams has only neck tattoos) and Jones has a lighter complexion.

[6] Hunt, Porter, and Pugh were shown the same photograph of Williams.

also the person that tried to walk behind Dynnell." Pugh identified Williams from a six-pack photographic lineup and wrote under Williams's photograph, "On 8-22-19 the above was at my residence and told someone else to blow my head-off." Pugh told the detectives that "Williams'[s] role was telling the other individual to blow his fucking head off."

In an October 31, 2019 recorded interview with Los Angeles County Sheriff's Detective Hartman, Pugh stated "the baby's father" (Williams) said to "'blow his [head] off'" when Jones started to flank Pugh.[7] When Detective Hartman asked Pugh if he was 100 percent sure that Williams said "blow his head off," Pugh answered, "It—to be honest, I'm not 100 percent sure about that." Pugh added, "But I am 100 percent—if he didn't say it, then he said, 'I'm going to blow his head off,' or 'blow his fucking head off.'" Pugh testified he was "mostly sure" Williams made the statement because of Williams's position in relation to Pugh.

4. *Jones's police interview and trial testimony*

The People called Jones as a witness, but he refused to answer most questions, stating repeatedly, "I don't understand." However, when asked whether he was afraid of Williams, he responded, "No." When asked whether he understood he could be held in contempt if he refused to answer questions, Jones responded, "I just took eight years." When asked whether he was a "snitch," Jones replied, "I don't understand." When asked again, he answered, "I'm not going to answer." When the trial court ordered Jones to answer the prosecutor's questions, Jones stated, "I'm just frustrated," adding, "I got an innocent man

---

[7]     It appears the reference to the "baby[]" is to Nevaeh.

6

sitting right here, a man that didn't do nothing." After the trial court reiterated that Jones did not have the right to refuse to answer the questions, Jones repeated, "I don't understand."

      The prosecutor then questioned Jones:

"Q:    Mr. Jones, . . . So I'm asking you to give us your side of the story.

"A:    He['s] innocent.

"Q:    Okay.

"A:    That's [the] only thing I got to say. He didn't do nothing.

"Q:    So you're saying that he didn't tell you to do anything?

"A:    No.

"Q:    He never told you to shoot somebody?

"A:    No.

"Q:    Okay. He never gave you a gun?

"A:    No.

"Q:    Okay. Did he tell you to go to the person's house?

"A:    No. I'm a friend of the family.

"Q:    You're a friend of Nevaeh, right?

"A:    No, the family.

"Q:    The whole family?

"A:    Yeah. I go over there on my own. I go over there to eat, take a shower, change clothes.

"Q:    Okay.

"A:    I went over there on my own. Nobody told me to do nothing.

[¶] . . . [¶]

"Q:    What about Marvin? Do you know Marvin?

"A:    I don't know who that is.

[¶] . . . [¶]

"Q:  Did you tell detectives that you were afraid of Williams?

"A:  I don't want to answer that question.

"Q:  Why don't you want to answer that question?

"A:  Because I just don't."

At this point, Jones reverted to the response, "I don't understand" to most questions, including whether he had talked to sheriff's deputies about what happened to Nevaeh. At the conclusion of direct examination, the prosecutor asked, "Tell me why Mr. Williams is innocent." Jones responded, "I refuse to answer." The trial court ordered Jones to answer and reminded him that he could be held in contempt and serve additional time if he did not answer. But Jones refused to answer any additional questions.

On cross-examination, Jones refused to answer seven questions. Defense counsel first asked Jones: (1) whether he was charged in the same case as Williams; (2) whether he pleaded to assault with a gun before the trial started; (3) whether he faced a long prison sentence before he pleaded;[8] and (4) whether he had

---

[8]  Prior to closing arguments, the trial court informed the jury that the court took judicial notice that Jones pleaded no contest to assault with a firearm and admitted to a prior strike conviction. During defense counsel's closing argument, the trial court told the jury that the court took judicial notice that Jones was charged in the same case as Williams with attempted willful, deliberate, and premeditated murder, and as to that count, the People alleged Jones personally used a firearm and personally and intentionally discharged the firearm. Further, Jones was charged with three counts of assault with a firearm and one count of shooting at an inhabited dwelling. As to the assault

been previously convicted of robbery. Then defense counsel inquired: (5) "during your interview with police, did they tell you that if you helped them, it could be extremely beneficial?"; (6) "did the police tell you that you cooperating could change the outcome for you?"; and (7) "was there a point in your interview where the police turned off the tape and you started telling them about other crimes"? At this point defense counsel said she had no further questions.

On redirect examination, after Jones refused to answer any additional questions, the prosecutor played Jones's recorded October 31, 2019 police interview to the jury. In the interview, Jones stated he was from the Two P's and a B gang and went by the nickname "Troop." Jones was very close to Williams and his family. Jones stated Williams is "a powerful man" from the 8-Trey Hoover gang. Jones was "pretty sure" Williams was a high-ranking gang member because of "the shit he did."

On the day of the shooting, Williams picked Jones up and drove him to a house where they smoked and played dominoes. Williams showed Jones a video of some "girls jumping" Nevaeh. Williams and his family wanted Ramaiya to have a one-on-one fight with Nevaeh or another girl named Jackie. Jones, Williams, and Marvin (a Black Watts Mafia gang member) drove to Pugh and Hunt's house. Before Jones got out of the car, Williams gave him the gun. According to Jones, Williams told him "any funny shit like, going on like, squeeze on a fool." Jones replied, "[A]lright bro. Alright." Jones felt Williams "low key like

---

charges, the People alleged Jones personally used a firearm and had a prior conviction of a serious or violent felony.

threatened" him because Williams was "a god" and Williams and his brothers were "somebody."

During the confrontation, Jones walked over to Pugh's side intending to fight him. But when Williams said, "none of that, I'll blow your motherfucking head off," Pugh pulled out his gun from his hip and shot first. Jones then pulled out his gun from his pocket and shot back. Jones believed if he did not react the way Williams wanted him to react, he "was fucked." Further, Marvin, who stayed in the car during the confrontation, also had a gun. Jones believed if he did not shoot, Marvin would have "finished the whole thing" and shot Jones. After the shooting, Jones gave the gun back to Williams. Jones added as to the shooting, "I didn't want to do it. Like, it wasn't supposed to go down like that. It really wasn't. It was supposed to be a simple fight between the girls."

B. *The Defense Case*

On August 21, 2019 Williams's mother, Gwendolyn Brice, picked up Nevaeh from school after Nevaeh and Raimaya were suspended for fighting. Brice took Nevaeh back to Brice's house, which was down the street from Pugh and Hunt's house. At some point Jones, whom Brice described as "Troop," came over to Brice's house. Brice described Jones as being "like a son." Rilesha Godfrey (Williams's sister), and Jonese (Godfrey's wife) also came to Brice's house, and Jones, Godfrey and Jonese spent time in Brice's garage.

Later that afternoon Nevaeh went outside and had a second fight with Ramaiya and Ramaiya's two friends in the middle of the street between Brice's house and Pugh and Hunt's house. According to Nevaeh, "at the end of the fight, they jumped

10

me again." When Neaveh returned to Brice's house, she received text messages from the girls, and Jones, Jonese, Godfrey, and Godfrey's niece decided to walk over to Pugh and Hunt's house. Nevaeh followed.

Williams later joined the group in front of Pugh and Hunt's house. According to Godfrey, Williams was "pretty calm, but that's his daughter; so he was upset." While Williams and Pugh were talking, Godfrey noticed Pugh had a gun in his pocket. Godfrey told Williams that Pugh had a gun; Williams gave a nod and replied he "didn't give a fuck that [Pugh] had a gun." Nevaeh denied hearing Williams say "blow the mother fucker's head off," "blow the fucker's head off" or "I'm going to blow the fucker's head off." Nevaeh heard Pugh say "get off my property" and "something about shoot." When Pugh reached into his pocket and pulled out his gun, the group ran. Godfrey and Nevaeh denied seeing Jones or anyone else other than Pugh with a gun.

Los Angeles County Sheriff's Deputy Gerardo Guerrero testified that he and his partner arrived around midnight in response to a report about a shooting. Pugh told the deputies the group involved in the confrontation included two Black female juveniles, the mother of one of the female juveniles, and a Black male juvenile. Pugh did not mention that another Black male was in the group. Pugh reported that the shooter had facial tattoos and said to Pugh, "I am going to blow this nigga's head off." Pugh stated he owned a gun but did not have one in his possession during the incident. Pugh told the deputies that he had a video of the incident. When Deputy Guerrero asked to see the video, Pugh stated he could not remember his password but he would make the video available for the deputies in the future.

11

C.     *The Verdicts and Sentencing*

The jury found Williams guilty of the attempted willful, deliberate, and premeditated murder of Pugh (Pen. Code,[9] §§ 187, subd. (a), 664; count 1); assault with a firearm of Hunt, Porter, and Pugh (§ 245, subd. (a)(2); counts 2, 3 & 5); and shooting at an inhabited dwelling (§ 246; count 4).  As to count 1, the jury found that a principal was armed with a firearm (§ 12022, subd. (a)(1)).  Williams later admitted he had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) that were serious felonies within the meaning of section 667, subdivision (a)(1).  On September 18, 2020 the trial court sentenced Williams to an aggregate state prison sentence of 106 years to life.[10]

Williams timely appealed.

---

[9]     Further undesignated statutory references are to the Penal Code.

[10]     The 106-year sentence was comprised of consecutive terms of 36 years to life on count 1 for attempted premeditated murder (25 years to life, plus one year for the firearm enhancement and 10 years for the two serious felony enhancements); and 35 years to life on counts 2 and 3, respectively, for assaults with a firearm on Hunt and Porter (including the two serious felony enhancements).  The court stayed the sentences on count 4 and 5, respectively, of 25 years to life for shooting at an inhabited dwelling and 35 years to life for assault with a firearm on Pugh (including 10 years for the serious felony enhancements).

## DISCUSSION

A. *The Admission of Jones's Prior Statements to Detectives Did Not Violate Williams's Confrontation Rights*

1. *Governing law*

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.""'" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621; accord, *People v. Wilson* (2021) 11 Cal.5th 259, 289-290.)

"The Sixth Amendment's confrontation clause does not prohibit admitting into evidence 'testimonial' hearsay statements against a defendant if the declarant appears for cross-examination at trial." (*People v. Cowan* (2010) 50 Cal.4th 401, 463; accord, *People v. Rodriguez* (2014) 58 Cal.4th 587, 632 ["'when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements'"].) Further, a witness's refusal to answer some questions during cross-examination does not mean admission of the witness's out-of-court statement violates a defendant's right to confrontation. As the Supreme Court explained in *People v. Homick* (2012) 55 Cal.4th 816, 861

13

(*Homick*) in affirming the trial court's admission of a witness's prior inconsistent statements to impeach his trial testimony, "While [the witness's] refusal to answer defendant's counsel's questions 'narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.'" (Accord, *Rodriguez*, at pp. 632-633; *People v. Perez* (2000) 82 Cal.App.4th 760, 766 (*Perez*).)

2. *There was no violation of Williams's confrontation rights*

Williams contends, relying on *People v. Rios* (1985) 163 Cal.App.3d 852 (*Rios*), the trial court's admission of Jones's testimonial statements to detectives violated Williams's Sixth Amendment right to confrontation because Jones refused to answer any questions on cross-examination. Because Jones testified on direct examination, providing testimony favorable to Williams, there was no constitutional violation.

In *Rios*, the prosecutor called two witnesses to corroborate an accomplice's testimony that the defendant committed a murder, but both witnesses refused to answer questions on the stand other than to state their names and, as to one witness, his age. (*Rios, supra*, 163 Cal.App.3d at pp. 860-861.) The trial court ruled the witnesses' prior statements to detectives implicating the defendant were admissible as inconsistent statements under Evidence Code section 1235. (*Id.* at p. 860.) The Court of Appeal reversed, concluding the witnesses' statements to the detectives were not admissible as prior inconsistent statements because the

14

witnesses gave no testimony.  (*Id*. at p. 864.)  Further, "the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness."  (*Id.* at pp. 864-865.)  The court explained, "While both [witnesses] took the stand, there was no opportunity to contemporaneously cross-examine when the prior statements were made or the ability to meaningfully cross-examine [the witnesses] at trial.  Observing the demeanor of a totally recalcitrant witness when questioned about matters he refuses to answer 'is as meaningless as attempting to gain information as to the truth of the unknown facts from his responses.'"  (*Id.* at p. 865.)

Unlike the two witnesses in *Rios*, Jones answered some of the prosecutor's questions, and his responses were favorable to Williams.  Jones testified that Williams was innocent; Jones was not afraid of Williams; Williams "didn't do nothing"; Williams did not bring him to Brice's house; Williams did not give him the gun; Williams did not tell him to shoot; and Jones did not know Marvin.  Jones concluded, "I went over there on my own.  Nobody told me to do nothing."

*Homick* is directly on point.  There, the prosecutor called the defendant's confederate as a witness after the confederate pleaded guilty as an accomplice to the two murders for which defendant was on trial. (*Homick, supra*, 55 Cal.4th at pp. 856-857.)  The confederate unexpectedly testified he "'was physically forced into'" making his prior statements to police admitting his participation in the murders, and his guilty plea was based on "'lies.'"  (*Id*. at p. 857.)  Over the defendant's objection, the trial

15

court permitted the prosecutor to impeach the confederate with his testimony at the preliminary hearings and his statement to police.  (*Ibid.*)  During the prosecutor's continued examination, the confederate "claimed forgetfulness" and refused to answer most questions other than to assert he had been coerced to make his prior statements, he had been forced to take polygraph examinations to get him to answer questions favorable to the prosecution (despite the court's admonition not to mention polygraph tests), and he had previously simply repeated what police, prosecutors, and his former attorney told him to say.  (*Id.* at pp. 857-858.)  On cross-examination, the confederate "continued his disruptive pattern of interjecting irrelevancies, referring to polygraph tests, claiming lack of memory, sitting mute, and once in a while providing a responsive answer."  (*Id.* at p. 858.)

The Supreme Court rejected the defendant's argument that the confederate's refusal to answer questions during cross-examination violated the defendant's confrontation rights, observing the confederate testified at length at trial and was subjected to a lengthy cross-examination, even though he refused to answer defense counsel's questions.  (*Homick, supra*, 55 Cal.4th at p. 861.)  Further, the confederate was called as a witness by the prosecution, and "to the extent that his behavior on the stand reflected poorly on his credibility, it benefitted defendant."  (*Ibid.*)  Similar to *Homick*, while Jones's refusal to answer questions on cross-examination "'narrowed the practical scope of cross-examination,'" the jury had the opportunity to assess his demeanor and decide whether Jones's earlier statements implicating Williams were credible.  (*Ibid*; accord, *People v. Rodriguez, supra*, 58 Cal.4th at p. 632-633 [although the

16

witness's "claim of total lack of recall limited defendant's ability to cross-examine her about her prior statements" to law enforcement, "her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements"]; *Perez, supra*, 82 Cal.App.4th at p. 766 ["Even though [the witness] professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements."].)

Admittedly, Williams was unable to cross-examine Jones about his possible bias, unlike *Perez, supra*, 82 Cal.App.4th at page 766, in which the witness answered questions relating to her possible bias (denying she had a romantic interest in the officer to whom she made statements identifying the defendants and the vehicle used in the murder). (See *People v. Pearson* (2013) 56 Cal.4th 393, 455 ["'As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias.'"]; *People v. Brown* (2003) 31 Cal.4th 518, 544 (*Brown*) [same].) On cross-examination, Jones refused to answer seven questions posed by defense counsel, including whether he was charged in the same case as Williams, whether he had pleaded guilty to assault with a gun; whether he faced a long prison sentence before he pleaded; and whether the police told Jones he would benefit from cooperation. Although Jones refused to answer these questions, the jury learned the answers from the trial court, which advised the jury

17

that Jones was charged in the same case as Williams with attempted willful, deliberate, and premeditated murder, shooting at an inhabited dwelling, and three counts of assault with a firearm but he pleaded no contest to assault with a firearm. Further, Jones testified he "just took eight years." In her closing argument, defense counsel argued, "Jones got eight years on a serious case"; during Jones's interview, the police made "subtle promises" that the district attorney would take "everything into consideration"; the police made "threats," including telling Jones twice that "he's looking at 25 to 30 years" and Jones will "never be able to hug [his kids] again"; and the police threats were "effective" because Jones told a "story which actually couldn't have happened."[11] Williams therefore was able to present evidence showing possible bias and to argue that Jones's prior statements to detectives were not credible.[12] On this record, the

---

[11] Defense counsel argued Jones's version of the events could not have happened because it would mean every defense witness was lying, Jones's statement that he and Williams arrived together at Pugh and Hunt's house was inconsistent with the video footage, and it would not make sense for Williams to try to address Neveah's problem at school by planning with Jones to shoot Pugh, because Williams had never met Pugh before.

[12] The principal question on which no information was provided was whether the police turned off the tape recorder during Jones's interview, at which time Jones told the detectives "about other crimes." But Williams did not present any evidence to suggest the tape recorder was turned off and back on during the interview. Jones also did not respond as to whether he had a prior conviction of robbery, but Williams's attorney did not attempt to impeach Jones with evidence of a prior conviction.

admission of Jones's statements to the detectives did not violate Williams's confrontation rights.

B. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Williams's Gang Membership*

1. *Trial court proceedings*

Prior to Jones's testimony, defense counsel sought to exclude any reference to Williams's gang membership, arguing there was no gang allegation and the gang evidence was highly inflammatory and prejudicial. Defense counsel alternatively requested the court sanitize the evidence to admit statements that Jones feared Williams because of his reputation but exclude any mention of Williams's gang affiliation. The prosecutor argued the gang evidence was relevant to explain why Jones was scared of Williams in light of Jones's belief that Williams, as a high-ranking gang member, "has the ability and means to do things to [him]."

The trial court found evidence of Williams's gang membership was admissible. The court explained, "[I]t would go to Mr. Jones's credibility whether he testifies favorably for the People in which case they may claim that his credibility is bolstered by the fact that . . . he gave this only in the face of the potential danger to himself. If he testifies favorably for the defendant, certainly there may be the argument that he is doing that because he is afraid of Mr. Williams. . . . It's a very different thing to just be fearful of someone . . . because . . . maybe they have some sort of financial hold over you or because they are your older sibling or . . . your neighbor and you don't want to have a problem with your neighbor, that kind of thing. That's very different from being afraid of someone who is a gang member,

particularly if that person is fairly high up in the hierarchy, which it sounds like Mr. Jones is indicating Mr. Williams is. That carries a different level of fear and a different level of consequences. So I do believe that would be properly admitted in terms of Mr. Jones's credibility and that the jury may consider it for that purpose. But also I think it goes to the issue of Mr. Williams'[s] culpability as an aider and abettor. If the jury believes that he did make this statement [to blow Pugh's "head off"], then the jury has to consider whether that and his action in conjunction with that renders him guilty as an aider and abettor. And I think it is certainly proper for the jury to consider whether someone making this statement is someone who is in a position to give an order that he would expect to have followed out as opposed to just someone . . . talking or blowing off steam or whatever."

      2.    *Governing law*

   "'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87 (*Hardy*); accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31; accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).) However, in cases not involving a gang allegation, "'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; accord, *People v. Becerrada* (2017)

2 Cal.5th 1099, 1022.)  Further, "'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."'" (*Chhoun*, at p. 31; accord, *People v. Melendez* (2016) 2 Cal.5th 1, 28-29.)

"'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.'" (*People v. Flinner* (2020) 10 Cal.5th 686, 724; accord, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084; *People v. Burgener* (2003) 29 Cal.4th 833, 869.)  "An explanation of the basis of the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court." (*Burgener*, at p. 869; accord, *People v. Merriman* (2014) 60 Cal.4th 1, 86.)

"'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy, supra*, 5 Cal.5th at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.)  "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on

21

the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *Bell*, at p. 105 ["'"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].)

"On appeal, we review for abuse of discretion a trial court's ruling on whether the evidence is relevant, not unduly prejudicial, and thus admissible." (*McKinnon, supra,* 52 Cal.4th at p. 655 [trial court did not abuse its discretion in admitting gang evidence to show defendant's motive for shooting victim was to retaliate for murder committed by rival gang]; accord, *Brown, supra*, 31 Cal.4th at p. 547 [trial court did not abuse its discretion in admitting evidence that defendant took an oath on his gang when he shot the victim, which showed his statement that he shot the victim was truthful and not "mere bravado"].) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*Hardy, supra*, 5 Cal.5th at p. 87; accord, *People v. Bell, supra*, 7 Cal.5th at p. 105.)

> 3. *The prejudicial effect of Williams's gang membership did not substantially outweigh its probative value*

Williams contends evidence he was a high-ranking member of the 8-Trey Hoover gang was not relevant to any disputed fact and was highly prejudicial because there was no gang allegation. The trial court did not abuse its discretion.

Evidence that Williams was a high-ranking gang member, causing Jones to fear him, explained why Jones shot Pugh at

22

Williams's instigation, even though Jones did not have a personal dispute with Pugh. In addition, Williams's status in the gang helped explain why at trial Jones denied Williams had any involvement in the shooting, contradicting his prior statements to detectives. Thus, although the gang evidence was prejudicial, its probative value was far from "'minimal.'" (*People v. Becerrada, supra*, 2 Cal.5th at p. 1022; *People v. Hernandez, supra*, 33 Cal.4th at p. 1049.) In light of the importance of the gang evidence to explain the shooting and Jones's credibility in claiming Williams was innocent, the trial court did not abuse its discretion in determining the gang evidence's probative value substantially outweighed its prejudicial effect even in the absence of a gang allegation. (See *McKinnon, supra*, 52 Cal.4th at p. 655; *Brown, supra*, 31 Cal.4th at p. 547.)

C.    *The Trial Court Did Not Abuse Its Discretion in Denying Williams's Motion for New Trial*
      1.    *Proceedings below*

Following the verdicts, Williams moved for a new trial under section 1181, subdivision (8), based on newly discovered exculpatory evidence. In support of his motion, Williams submitted a handwritten letter Jones wrote to defense counsel a week after the trial ended and a report from a defense investigator based on an interview with Jones three months later.

In his March 13, 2020 letter to defense counsel, Jones stated he had lied to detectives about Williams's involvement in the shooting. Jones wrote he had acquired the gun a week before the incident for protection, and neither Williams nor anyone else knew Jones carried a gun. Jones "lied out of fear" of facing a life

23

sentence when he told detectives that Williams gave him a gun and wanted him "to shoot if anyone moved wrong." After Williams told Pugh, "'I don't give a fuck about your gun,'" it was Jones who warned Pugh that Jones would "'blow his fucking head off." Jones wrote, "[Williams] never said that (I swear). I lied because the detectives kept leading me to say that he said it." According to the report prepared by a defense investigator, Jones reiterated in an interview that Williams was innocent. Williams did not know about Jones's gun or instruct him to shoot Pugh, and Jones was the person who said, "I'll blow your fucking head off." The detectives wrote on a white board the responses they wanted to hear from Jones, and they told Jones to say he was afraid of Williams.

The trial court denied Williams's motion for new trial. The court stated, "I don't believe that there is anything that is terribly new in [the material], and the material that is included does not appear to the court that there would likely be a different result based on the new—well, based upon the information that's in the defense moving papers."

2.     *The trial court did not abuse its discretion in denying Williams's new trial motion*

Section 1181, subdivision (8), authorizes the trial court to grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." On a motion for new trial based on newly discovered evidence, the trial court properly considers the following factors: (1) the evidence (not just its materiality) is newly discovered; (2) the evidence is not cumulative; (3) the evidence would have rendered a different

24

result probable on retrial; (4) the moving party could not with reasonable diligence have discovered and produced the evidence at trial; and (5) the new facts are shown by the best admissible evidence.  (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016-1017; *People v. Howard* (2010) 51 Cal.4th 15, 43.)

"'"[T]he trial court has broad discretion in ruling on a new trial motion . . . ,' and its 'ruling will be disturbed only for clear abuse of that discretion.'  [Citation.]  In addition, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"  (*People v. O'Malley, supra*, 62 Cal.4th at p. 1016; *People v. Howard, supra*, 51 Cal.4th at pp. 42-43 ["'"'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"'"].)

As a threshold matter, Williams did not comply with the statutory requirement for a new trial motion by producing an affidavit from Jones.  Section 1181, subdivision (8), provides, "When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."  Williams did not present an affidavit or request additional time to obtain one.

Moreover, substantial evidence supports the trial court's finding there was nothing "terribly new" in the evidence and it was not probable the evidence could be used to achieve a more favorable result at a new trial.  Jones testified at trial that

25

Williams was innocent, Williams did not give Jones the gun, Williams did not instruct Jones to shoot, and "[n]obody told [Jones] to do nothing." The only new statement from Jones was that the detectives told Jones what they wanted him to say, including that he was afraid of Williams. But in the absence of an affidavit from Jones or any other indicia of the truthfulness of this new statement, the trial court did not abuse its discretion in concluding this information would not have made a different result probable on retrial. (See *People v. Beeler* (1995) 9 Cal.4th 953, 1005 [denial of motion for new trial was not abuse of discretion where "[d]efendant did not produce a single affidavit by any witness who could have presented credible evidence of his alleged organic brain damage"]; see also *People v. Ethridge* (1962) 204 Cal.App.2d 279, 283 [affidavit from defendant's attorney did not provide "sufficient legal basis for a new trial on the ground of newly discovered evidence, and the court would have been justified in denying the motion"].)

## DISPOSITION

The judgment is affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.          SEGAL, J.

26